```
              UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLORADO

                      ----------

MATTHEW PILATTI, an       )
individual,               )
                          )
          Plaintiff,      )
                          )
VS.                       ) CASE NO. 17-CV-01307-MEH
                          )
HACIENDA II PARTNERS,     )
LLLP,                     )
                          )
          Defendant.      )

                      ----------
```

THE ORAL DEPOSITION of JEREMY SWENSON, produced, sworn and examined on behalf of the Defendant, pursuant to Notice to Take Deposition, on Tuesday, October 9, 2018, beginning at 10:09 a.m, at the offices of Heritage Reporting Service, 1100 Main Street, Suite 1880, Kansas City, Missouri, before me,

```
                    R. PATRICK TATE
                CERTIFIED COURT REPORTER
                   HERITAGE REPORTING
```

a Certified Court Reporter, in a certain cause now pending In the United States District Court, wherein the parties are as hereinbefore indicated.

```
                   A P P E A R A N C E S:
```

For the Defendant:

    Lasater & Martin
    8822 S. Ridgeline Boulevard, Suite 405
    Highlands Ranch, Colorado  80129
    By J. Scott Lasater, Esq.
    Email:  scott@lasaterandmartin.com



Case 1:17-cv-01307-CMA-MEH   Document 69-2   Filed 11/05/18   USDC Colorado   Page 2 of 20

Jeremy Swenson-10/9/2018
Matthew Pilatti vs. Hacienda II Partners, LLLP

Page 2

1       APPEARANCES CONTINUED
2  For the Plaintiff:
3       Thomas, Keel & Laird, LLC
        50 South Steele Street, Suite 450
4       Denver, Colorado  80209
        By Matthew R. Laird, Esq.
5       Email:  mlaird@thomaskeel.com
6
7
8
9       EXAMINATION INDEX
10 Examination by Mr. Lasater..................... 3
11 Examination by Mr. Laird....................... 125
12 Further Examination by Mr. Lasater............. 132
13 Further Examination by Mr. Laird............... 134
14 Further Examination by Mr. Lasater............. 136
15
16       EXHIBIT INDEX
17 EXHIBIT      DESCRIPTION          PAGE
18 EXHIBIT 1   List of Missouri cases.............  36
19 EXHIBIT 2-1 Picture from Facebook page.........  95
20 EXHIBIT 2-2 Picture from Facebook page.........  95
21
22
23
24
25

Page 3

1              PROCEEDINGS
2  Thereupon,
3              JEREMY SWENSON
4  was called as a witness and, having been duly
5  sworn, was examined and testified as follows:
6              EXAMINATION
7  BY MR. LASATER:
8  Q  And would you state your name for the record.
9  A  Jeremy Swenson.
10 Q  Mr. Swenson, my name again is Scott Lasater.  You
11    know that we met earlier today, and I represent a
12    restaurant, actually a restaurant group.  The
13    restaurant that's at issue in this case is
14    Hacienda, it's the Hacienda Restaurant, Colorado;
15    you know that, right?
16 A  Yes.
17 Q  And you've been retained as an expert in this
18    case, am I right?
19 A  Yes.
20 Q  Can you tell me -- we'll got into your background
21    and history and all that so I learn a little bit
22    about you because I don't think we've ever met.
23    Do you think we've ever met?
24 A  I don't think so.
25 Q  You kind of look familiar, but, you know, at this

Page 4

1     age, a lot of people do.  So you've been hired as
2     an expert in this case, right?
3  A  Yes.
4  Q  And in what area are you an expert?
5  A  Snow and ice removal.
6  Q  Snow and ice removal?
7  A  (Witness nods affirmatively.)
8  Q  Okay.  So opinions that you have given in this
9     case concern the area of snow and ice removal and
10    no other areas, right?
11 A  Yes, that's correct.
12 Q  Okay.  And you don't hold yourself out as being
13    an expert in property management, do you?
14 A  No.
15 Q  And you don't hold yourself out as being an
16    expert in small business ownership and the duties
17    and obligations of small business owners as it
18    relates to their real property, do you?
19 A  Well, I would say that I am an expert in snow and
20    ice removal contracts.  So with regards to
21    contracts with snow and ice removal, I would say
22    I'm an expert in that.  So that would be the only
23    thing I would say to that.
24 Q  That's fair.  And a lot of small businesses have
25    snow removal contracts, seems like.  It's hard to

Page 5

1     put a number on that, right?
2  A  Yes.
3  Q  It's also really hard to define what a small
4     business really is, I guess, in terms of revenue
5     or volume of individuals visiting property or
6     whatnot, correct?
7  A  Yes.
8  Q  Would you classify Hacienda as a small business,
9     at least the restaurant?
10 A  I really haven't looked at them as far as, you
11    know, are they a small business, large business
12    or what.
13 Q  But in this case, you're only offering opinions
14    as to the snow and ice removal at Hacienda?
15 A  Yes.
16 Q  But you're not offering opinions based on the
17    property management or how they take care of
18    their real property other than snow and ice
19    removal, correct?
20 A  Yes, that's correct.
21 Q  Okay.  A couple of things I noted in your report
22    when I read through it, it's lengthy, so I thank
23    you for the thoroughness there.  Sometimes we
24    don't get those 20-some-odd page reports, but I
25    noticed that you really didn't go outside the

Case 1:17-cv-01307-CMA-MEH   Document 69-2   Filed 11/05/18   USDC Colorado   Page 3 of 20

Jeremy Swenson-10/9/2018
Matthew Pilatti vs. Hacienda II Partners, LLLP

Page 6

1  scope, doesn't seem like, of snow and ice
2  removal; in other words, you didn't talk about
3  the lighting, for instance, that existed at the
4  property?
5  A  That's correct.
6  Q  Is there -- is there any reason why you didn't
7  address the visibility of the parking lot and the
8  lighting the night that Mr. Pilatti was injured?
9  A  I'm really not a lighting expert.  I mean,
10  sometimes I do comment on lighting, but I just
11  didn't really, in this case, didn't really look
12  at that.
13  Q  That's not something you do, go out and measure
14  lumens and --
15  A  No.
16  Q  -- candle strength or whatever they call it?
17  A  No.
18  Q  Okay.  And I also noticed that you didn't -- you
19  didn't comment in your report at all on I will
20  call it human factors, but the contribution to
21  the fall that Plaintiff himself had.  Is that
22  intentional?
23      MR. LAIRD:  Foundation.
24  A  Yeah, I'm not a human factors expert, so that's
25  why they've got those people.

Page 7

1  Q  (By Mr. Lasater)  Okay.  So, it didn't seem
2  like, unless I missed it, you made any comment
3  on whether Mr. Pilatti --
4      MR. LASATER:  And am I saying that
5  right?
6      MR. LAIRD:  Yes.
7      MR. LASATER:  Let me start my question
8  over.
9  Q  (By Mr. Lasater)  I notice you didn't make any
10  comment, or at least it didn't seem like you
11  made any comment, on whether Mr. Pilatti should
12  have been able to see ice on the parking lot,
13  if ice, in fact, existed, so that's because
14  that's outside the scope of what you analyzed,
15  right?
16  A  Yeah, I mean, I just -- I didn't really comment
17  on that, no.  I did say that once he fell, he did
18  feel like he felt there was ice there, so I did
19  say that.
20  Q  According to him, right?
21  A  Yes.
22  Q  Let me go back to some of your background.  Did
23  you -- were you born and raised in this area?
24  A  Yes, I was born in Wichita, Kansas.  But when I
25  was two, I moved to Kansas City and I've lived

Page 8

1  here since I was two.  So most of my life.
2  Q  Have you ever heard of Wichita Water, the
3  Culligan Company?
4  A  No, I have not.
5  Q  Just a new client I just started representing.
6  They're out of Wichita, funny enough.  So you --
7  I'm sorry, where did you say you moved to?
8  A  I moved here when I was two.
9  Q  So Kansas City?
10  A  Born during the Viet Nam war at McConnell Air
11  Force Base and we moved here when I was two.
12  Q  And what year were you born?
13  A  1970.
14  Q  '70, that's a good year.  So you went to high
15  school here?
16  A  Yes.
17  Q  Did you go to college?
18  A  I went to Johnson County Community College for
19  two years and then I never finished after that,
20  so some college.
21  Q  Where is Johnson County Community College?
22  A  It is -- well, it's over in Kansas.  It's, you
23  know, probably 30 minutes from here.  It's over
24  in Johnson County, the county called Johnson
25  County.  It's on the south side; it's on kind of

Page 9

1  the south and west side of the City.
2  Q  That makes sense.  Was there anything in
3  particular you studied there or was it you just
4  took general classes?
5  A  It was just general studies.
6  Q  Okay.  And why did you not complete your -- I
7  guess that would be an associate's degree there?
8  A  Yes.  I was going to go into turf grass
9  management, was what my plan was and I decided to
10  put that on hold, and maybe get a business degree
11  on the side, but just ended up starting my own
12  business and never finished.
13  Q  Okay.  When you were thinking about turf grass
14  management, was that because you were working at
15  a golf course?
16  A  I did, I worked at a golf course for eight or
17  nine years, and that's when I started doing snow
18  and ice removal, was back then.
19  Q  Snow and ice removal at the golf course?
20  A  Yes.  I was responsible for the snow and ice
21  removal of the parking lots and the sidewalks
22  there, and the driving range.  They had a large
23  driving range, one of the largest in the United
24  States.
25  Q  Oh, really?

Case 1:17-cv-01307-CMA-MEH   Document 69-2   Filed 11/05/18   USDC Colorado   Page 4 of 20

Jeremy Swenson-10/9/2018
Matthew Pilatti vs. Hacienda II Partners, LLLP

Page 10

1  A  Uh-huh.
2  Q  What was that golf course called?
3  A  It was called Smiley's Golf Complex.
4  Q  Okay. And did you work for anybody else while
5     you worked for Smiley's?
6  A  Sometimes I would work -- I started off working
7     part-time, so I would work in the winters. I
8     would work at other places in the wintertime.
9     And then I became full-time after a number of
10    years.
11 Q  At Smiley's?
12 A  Yes.
13 Q  And when did you leave Smiley's?
14 A  Well, let me look here. The years go by. It
15    would have been in 1995.
16 Q  '95. Okay. It's funny, you don't really think
17    of golf courses as places that need a lot of snow
18    and ice removal.
19 A  Yeah. When snow is here and ice is here, they
20    have to have their parking lots cleared and
21    sidewalks cleared, too, because the people come
22    out, especially the driving range there, they
23    come out and use the driving range in the
24    wintertime.
25 Q  Do you, in this area -- I'm talking about this

Page 11

1     geographic area -- seems like -- and just feel
2     anytime today to tell me if I'm wrong about
3     anything, but it seems like you guys get, your
4     bias, your weather bias here is more towards
5     icestorms, almost, than it is real snowstorms?
6  A  We do, we average about 19 inches of snow, but we
7     do get more ice. We get a lot of ice,
8     refreezing, black ice. A lot of our storms start
9     off as rain, like today, and then it transitions
10    into sleet or freezing rain and then snow. So we
11    do get more ice than we do snow.
12 Q  Okay. Is this rain going to be cold enough
13    today, you think, to ice up?
14 A  I don't think so.
15 Q  Okay. So you kind of have -- I don't know if
16    it's a concentration or a particular interest in
17    your work in terms of ice remediation because
18    there's more ice out here?
19 A  Yes, I'm definitely an expert in ice, freezing
20    rain, sleet, black ice, melting/refreezing, we
21    have a lot of that here.
22 Q  In terms of ice, rain and things like that,
23    that's -- is it your understanding that Denver is
24    similar to that or is it different, in your
25    version?

Page 12

1  A  It can happen anywhere. I mean, Denver is
2     traditionally known to get more snow, straight
3     snow than that. But there can be sleet or
4     freezing rain anywhere.
5  Q  Have you ever been qualified in a district court
6     to give expert testimony?
7  A  Define "qualified."
8  Q  So the judge, you're sitting on the witness
9     stand, and the counsel that offers you as a
10    witness asks the court to allow you to give
11    expert opinion -- expert testimony or testimony
12    that we call opinion testimony, and a judge would
13    then say, Yes, Mr. Swenson is allowed to give
14    expert opinion testimony.
15 A  I've never been disqualified.
16 Q  But have you ever been qualified?
17 A  Not in that specific way you described, no.
18 Q  Okay. So you've never -- have you ever even
19    given testimony in court?
20 A  One time.
21 Q  And when was that?
22 A  It would have been four years ago.
23 Q  And what court, do you remember?
24 A  It would have been here in Kansas City.
25 Q  Would it be the state district court or is there

Page 13

1     a federal court here or --
2  A  I wasn't federal. It was a local, it was a local
3     court.
4  Q  And what was the subject matter of that
5     testimony?
6  A  It was a slip and fall case.
7  Q  That involves snow and ice?
8  A  Yes.
9  Q  But you were not qualified as an expert in that
10    case?
11 A  Well, I believe I am qualified as an expert. I
12    mean, if I was there and testified, if the judge
13    let me testify, I'm assuming that I was
14    qualified.
15 Q  Was that a case that you were sued in or was that
16    a case that you were working for somebody else?
17 A  No. I was working for someone else.
18 Q  Okay. Do you recall the name of the case, any
19    details?
20 A  I don't recall the exact name of it, no.
21 Q  But you do not believe the judge qualified you as
22    an expert?
23 A  Well, I have no reason to believe I wasn't
24    qualified. I'm not an expert in all the legal
25    terminology that you're talking about, but I

Case 1:17-cv-01307-CMA-MEH   Document 69-2   Filed 11/05/18   USDC Colorado   Page 5 of 20

Jeremy Swenson-10/9/2018
Matthew Pilatti vs. Hacienda II Partners, LLLP

Page 14

1  showed up, testified, and as far as I know,
2  everything was fine.
3  Q  Okay.  That's fair, that's fair.  I guess it
4  would be -- do you remember the judge saying,
5  Yes, Mr. Swenson is allowed to give opinion
6  testimony, because that's how it works, you would
7  actually hear him qualify you?
8  A  Yeah, I don't recall.  There was a lot of things
9  said and I don't recall everything he said,
10  truthfully.
11 Q  Have you ever been struck as a witness?
12 A  No, not to my knowledge.
13 Q  To your knowledge.  So you may have been struck
14  in cases or a case before, but you just wouldn't
15  necessarily know it?
16 A  I'm not aware of anything.  I do tell people I
17  work with that if there's any kind of challenge
18  or anything, I'd like to know about them.  But
19  I'm not aware of anything that's come out with
20  that.
21 Q  So you just have to depend on other people to
22  tell you if it's happening or not, I guess?
23 A  Yes.
24 Q  And as you sit here, you don't know whether
25  you've ever been struck?

Page 15

1  A  I don't believe I have, no.
2  Q  Okay.  And so 1995 is when you quit Smiley's, is
3  that what you said?
4  A  Yes.
5  Q  And you went to work for a mulch company of some
6  kind?
7  A  I started a mulch company.  That was one of my
8  first businesses.  So I was an owner there.
9  Q  Well, tell me about that.  What did you guys do
10  as a mulch company and how did you form it?
11 A  We sold -- like I had two partners and we started
12  our own mulch company so basically landscape
13  supplies, selling shredded mulch to landscapers
14  and property owners.
15 Q  And that was here in the Kansas City area?
16 A  Yes.
17 Q  And how did that eventually morph into you
18  getting more involved in the snow and ice removal
19  business?
20 A  Well, it was a seasonal business, so we would do
21  most of our business in the spring, summer, fall.
22  And in the wintertime, we didn't really have much
23  to do and there wasn't a lot of activity, so I
24  started to make extra money, I would be a
25  subcontractor for some of the larger companies

Page 16

1  here in town, so I started doing subcontracting;
2  so we had equipment, we had trucks, we had crews,
3  we had skid steer loaders and I would take that
4  equipment and go out and work for other companies
5  during snowstorms and I did sidewalk routes.  So
6  I did a number of years of snow removal for some
7  of the largest companies here in town.
8  Q  Which companies?
9  A  I worked for a company by the name of TrueNorth;
10  another one called Snow Fighters, USA.  Those are
11  the main two that I worked for.
12 Q  So would you put -- you'd take your equipment
13  used in the summertime, let's call it, the
14  non-wintertime?
15 A  Uh-huh.
16 Q  I guess that could be spring or fall.  And put a
17  plow on it, stuff like that?
18 A  We used mainly our skid steer loader.  We had
19  like a Bobcat skid steer loader and we would take
20  that out and use that to pick up snow and move
21  snow around.
22     And then I had a sidewalk crew for
23  several years, where we had a crew of people and
24  we had a route and we would go around and every
25  time it snowed or iced, I was the crew leader and

Page 17

1  I would go around and do the sidewalks on a
2  commercial sidewalk route.
3  Q  Would you get contracts with property owners to
4  do that work?
5  A  No.  We would work for the snow company and the
6  snow company would have the contracts.  They just
7  hired us as a subcontractor.
8  Q  Oh, as a subcontractor, that makes sense.  And
9  what did you morph out, if you did -- you're not
10  still in the mulch business, are you?
11 A  No.
12 Q  When did you I'll say morph out of it?  I don't
13  know if that's a good word or not, but when did
14  you transition out of the mulch and landscape
15  business into snow and ice remediation full-time?
16 A  Well, towards the end of the business, towards
17  the end of my time there, we did end up
18  starting -- I was the person who started up
19  different divisions for the company and so I
20  did -- I did start up a landscaping and the snow
21  removal division for Mulch Mart and I worked in
22  that.  So for three years we did pursue the
23  contracts directly with property owners.
24     And we did commercial snow and ice
25  removal and landscaping for three years before I

Case 1:17-cv-01307-CMA-MEH Document 69-2 Filed 11/05/18 USDC Colorado Page 6 of 20

Jeremy Swenson-10/9/2018
Matthew Pilatti vs. Hacienda II Partners, LLLP

Page 18

1 officially exited. So there was three years
2 where we did our own -- we started our own
3 company doing snow and ice removal direct. And
4 then in 2005, I ended up selling my shares, got
5 bought out by a partner. One of my partners did
6 not like the snow removal business, he just liked
7 the mulch business, so I purchased the snow
8 removal portion from him and so started Snowmen
9 at that time.
10 Q Snowmen?
11 A Snowmen, Inc., yes.
12 Q And what happened with the mulch business?
13 A It continued on for a number of years, and then
14 it eventually went out of business seven or eight
15 years later.
16 Q And were you an owner at that time?
17 A No.
18 Q And when was your partner's name?
19 A Tom Cannon.
20 Q Is he still around the area?
21 A I'm not sure. I haven't -- I haven't talked to
22 him for a long time. So he was in Michigan his
23 parents were in Michigan, I know he was there for
24 a while. I don't know if he's moved back or not.
25 Q Okay. What would you say was the point in time

Page 19

1 where you became full-time snow and ice
2 remediation?
3 A When I started Snowmen, we were 100 percent
4 dedicated to snow and ice removal at that time,
5 so...
6 Q And is that how it's continued on to the present?
7 A We -- we -- well, we are one of the largest snow
8 and ice removal companies in Kansas City, and we
9 did start a landscaping division three years ago.
10 So we have a landscaping division, but I have
11 managers that manage and run the landscaping
12 division while we still do have the snow and ice
13 removal.
14 Q What percentage would you say is the landscaping
15 division versus snow and ice removal?
16 A Probably about 15 percent.
17 Q Which is the 15?
18 A The landscape is about 15 percent.
19 Q Okay. Do you have other owners of Snowmen?
20 A No.
21 Q Just you?
22 A Yes.
23 Q And it looks like you're married. Is your wife
24 involved?
25 A I think she's the treasurer or something like

Page 20

1 that, but she -- she doesn't work in the business
2 day-to-day, no.
3 Q Not an owner or anything like that?
4 A No.
5 Q Has there ever been any other owners of Snowmen?
6 A No.
7 Q Do you have any other companies besides Snowmen?
8 A I do have Swenson Consulting that I do my
9 consulting work with.
10 Q Any others?
11 A The landscape business is set up in a separate
12 company called Snowmen 365, so it's set up in a
13 different entity.
14 Q Why did you do that?
15 A Just common practice in the business to split off
16 and have a landscaping side and a snow side.
17 Q All right. How many -- you said you were the
18 largest or one of the largest in the Kansas City
19 area?
20 A We are one of the largest, yes.
21 Q How do you know that?
22 A Well, because I know the different companies that
23 are here and their owners and what their
24 approximate, you know, contracts are, that sort
25 of thing.

Page 21

1 Q So do you base it on number of employees or do
2 you base it on amount of revenue that you earn or
3 what do you --
4 A It's the number of we call it acres serviced or
5 sidewalk area serviced, the number of properties
6 you actually service.
7 Q Can you tell me approximately how much you
8 service currently?
9 A Last year we serviced 575 commercial properties,
10 and all we do is commercial.
11 Q And are all of those on contract, written
12 contract?
13 A 99 percent of them are.
14 Q And you have seen the contract that was in this
15 case between Hacienda and Emerald Isle, right?
16 A Yes.
17 Q And so are they kind of similar to those
18 contracts?
19 A Similar, I mean, ours is better written, I think,
20 but it's similar.
21 Q Better lawyers? You don't have to comment. I
22 see you pursing your lips. So can you tell me
23 what your company does in let's say the summer
24 months, the Snowmen company?
25 A Well, we spend the offseason preparing our

Case 1:17-cv-01307-CMA-MEH   Document 69-2   Filed 11/05/18   USDC Colorado   Page 7 of 20

Jeremy Swenson-10/9/2018
Matthew Pilatti vs. Hacienda II Partners, LLLP

Page 26

1  A   It's SIMA.
2  Q   SIMA.
3  A   The Snow and Ice Management association, and it's
4      the largest association of snow and ice
5      contractors in the U.S. and Canada.  So it's an
6      industry trade organization for snow and ice
7      professionals and property managers, building
8      owners.
9  Q   And what sort of things do you do with this
10     organization?
11 A   Well, they -- they have best practices that they
12     have in place in regards to snow and ice removal,
13     you know, common practices; they have training,
14     materials, videos, DVDs; they have training
15     conferences, different training seminars they put
16     on throughout the year, webinars, such as the
17     Training and Resource Organization for the snow
18     and ice industry.
19 Q   Do you happen to know how many members?
20 A   Last I heard, there was over 20,000 members.
21 Q   Have you ever had any position with SIMA, like a
22     treasurer or president or anything?
23 A   I am involved on their committees, they have
24     different committees, national committees, for
25     different things, and I have been involved in a

Page 27

1      number of the different committees.
2  Q   Like what?
3  A   I was on their advanced contract clauses
4      committee for wording for contracts; I was -- I
5      was on their best practices committee for -- they
6      just redid their snow and ice removal best
7      practices and I was on their national best
8      practices committee; I was asked to speak two
9      summers ago at their national conference on snow
10     and ice removal industry standards, so I'm an
11     ongoing -- I'm involved in an ongoing basis.
12 Q   When you spoke at that conference, did you do a
13     PowerPoint or anything like that?
14 A   I did, yeah.
15 Q   Do you have that PowerPoint?
16 A   No.  I had to give it to SIMA and SIMA owns it.
17 Q   As they probably should.  Do you recall
18     specifically subject matter of some of that
19     presentation?
20 A   It was just -- you know, I am considered an
21     expert in industry standards, so I just --
22     there's a number of different industry standards
23     that are evolving out there from different
24     organizations, and it's just becoming an issue in
25     the snow and ice removal world, just that there

Page 28

1      are different standards that are arriving and
2      that weren't in place, written standards weren't
3      in place seven or years ago.
4  Q   Okay.  And are there now?
5  A   Yes.
6  Q   And these apply to snow and ice professionals?
7  A   They apply to snow and ice professionals,
8      property managers, building owners.  Pretty much
9      if people are deciding to do their own snow and
10     ice removal and taking it on themselves, that's
11     what it's written for.
12 Q   And so these are what you would refer to as
13     guidelines, not ordinances or laws?
14 A   Yes.
15 Q   And do you know to what extent they're made
16     available to snow and ice professionals, these
17     standards?
18 A   They're available online, anybody can get them.
19 Q   How about with regard to property managers,
20     property owners?
21 A   They're available online to anybody who wants
22     them, yeah.  They can go online to the SIMA
23     website and download them.
24 Q   How would they find out to even look on a website
25     to look at these guidelines?

Page 29

1  A   Well, you'd have to look online or do some
2      research regarding snow removal practices or
3      guidelines and it would come up on Google.
4  Q   Okay.  So these are non-mandatory guidelines,
5      right?
6  A   Correct.
7  Q   And so business owners, as far as you know, and I
8      know you're not an expert, professing to be in
9      this case, an expert in property management and
10     business ownership even though you are a business
11     owner, but there's nothing mandatory, as far as
12     you know, that would require a business owner to
13     look up these standards and see if their
14     practices are consistent with the guidelines,
15     right?
16 A   No.
17 Q   You had mentioned you testified in one case here
18     in I believe that was state court, you were
19     thinking, right?
20 A   Yes.
21 Q   And have you ever testified in a United States
22     District Court?
23 A   No.
24 Q   And by that I mean federal court, if I confused
25     the terms, at all?

Case 1:17-cv-01307-CMA-MEH Document 69-2 Filed 11/05/18 USDC Colorado Page 8 of 20

Jeremy Swenson-10/9/2018
Matthew Pilatti vs. Hacienda II Partners, LLLP

Page 30

1 A No, I have not.
2 Q Have you ever actually been in a United States
3 District Court house?
4 A No.
5 Q In terms of your Snowmen company, so let me just
6 sort of calculate this out, we are 2018 so is it
7 20 -- a little over 20 years?
8 A Yeah, I lose track. I started it in 2005, so --
9 Q So about 23 years?
10 A Is that right? Yes, okay.
11 Q Time flies.
12 A 2005 until now.
13 Q I just had my 34 wedding anniversary, so --
14 A Congratulations.
15 Q That's fast. Hard to believe. How many
16 properties do you think you've serviced in that
17 amount of time in 20 years, couple of thousand
18 maybe?
19 A Thousands and thousands, yeah. I mean, we've
20 been averaging 500 plus properties per year for
21 the last at least seven years, so well over 4- or
22 5,000.
23 Q Okay. And I think I heard you say earlier that
24 you claim to be an expert in snow and ice removal
25 and remediation, right?

Page 31

1 A Yes.
2 Q And an expert in the standards that are
3 applicable to snow and ice remediation?
4 A Yes.
5 Q And have you ever been accused of breaching those
6 standards, as an owner or worker at Snowmen,
7 Inc.?
8 A We have been sued. I mean, they didn't
9 specifically line out and say, You breached this
10 exact standard, but we have been sued.
11 Q But you've been sued where they've said you've
12 breached your contract, right, because you didn't
13 perform in accordance with the terms of the
14 contract?
15 A Yes.
16 Q And you've been sued with claims that you were
17 negligent in the performance of your work, right?
18 A Yes.
19 Q And do you happen to know how many times you've
20 been sued claiming that you were negligent in the
21 performance of your work?
22 A I don't know the exact number. It's -- it's at
23 least six or seven.
24 Q And who generally represents you, do you have one
25 lawyer?

Page 32

1 A No. We have insurance; insurance company chooses
2 the attorneys.
3 Q Do you have any current litigation going right
4 now?
5 A Not that I'm aware of.
6 Q So all the cases -- any of the cases go to trial,
7 as far as you know?
8 A None have gone to trial.
9 Q They've all settled?
10 A Yes.
11 Q Have they all been in -- I'm not sure I'm going
12 to say this right, but Kansas or Missouri state
13 court?
14 A Yes.
15 Q Nothing in federal court?
16 A No, not that I'm aware of. I don't always know.
17 I mean, we hand it over to the insurance
18 companies, the insurance companies handle it and
19 we don't get involved in most of it.
20 Q And have you ever -- maybe I asked you this
21 earlier, but have you given a deposition in one
22 of those cases in which you were sued?
23 A Yes.
24 Q And how many times?
25 A I don't recall the exact number; probably four or

Page 33

1 five.
2 Q Do you recall the cases or case names?
3 A No.
4 THE COURT REPORTER: Could I impose
5 upon you for a short break?
6 MR. LASATER: Yeah, sure.
7 (Brief recess.)
8 Q (By Mr. Lasater) So let me ask you a couple --
9 let me ask you a couple of questions about what
10 we were just talking about. We were just
11 talking about some of the getting involved in
12 four or five lawsuits, and I won't belabor
13 going through a lot of them, but one example of
14 a suit that you got -- your company or -- I
15 don't mean to say it that way. One of the
16 suits that your company was involved in had to
17 do with an individual named Keith Conner, do
18 you remember that, versus the Kansas City
19 Southern Railroad Company?
20 A That is -- vaguely, I do vaguely remember that, I
21 think so.
22 Q Okay. This is a case where a gentleman fell at a
23 place where your company did snow and ice
24 removal, and this is a case where you may
25 remember they alleged that Snowmen had a

Case 1:17-cv-01307-CMA-MEH  Document 69-2  Filed 11/05/18  USDC Colorado  Page 9 of 20

Jeremy Swenson-10/9/2018
Matthew Pilatti vs. Hacienda II Partners, LLLP

Page 50

1 does have a degree.
2 Q Do you know what it's in or where it's from?
3 A I don't know offhand.
4 Q We had talked earlier about whether you had been
5   precluded, meaning prevented, by a district judge
6   from giving testimony in a case, and you said you
7   didn't know of any?
8 A Correct.
9 Q Are you familiar with a case called Janice
10   Addison and Paul Klug versus Bucks Corporation,
11   it's a case that was filed in the District Court
12   of Iowa?
13 A That does ring a bell, that name.
14 Q Did you know that in that case, the judge found
15   that your testimony would do little to aid the
16   jury in reaching its conclusion and he struck you
17   as being an expert in that case; did you know
18   that?
19 A I did not know that.
20 Q I'm sorry?
21 A No, I did not know that.
22 Q Do you remember the name of the lawyer that hired
23   you in that case?
24 A Not right offhand, no.
25 Q Does that surprise you to learn that?

Page 51

1 A That is surprising, yes.
2 Q Is today the first day that -- sounds like the
3   first day you must have --
4 A Today is the first day, yes.
5 Q Looks like that was last summer, June 21, 2017.
6   That case, do you recall it just sort of going
7   away and nobody ever contacting you?
8 A I do recall that it ended.  I just was told that
9   it ended, that's what they told me.
10 Q Have you had other cases in the State of
11   Colorado?
12 A Yes.
13 Q How many would you say?
14 A Six or seven.
15 Q Any this year?
16 A Yes.
17 Q How many?
18 A They're ongoing.  I've got three I think ongoing
19   right now.
20 Q Do you know who the attorneys are in those cases?
21 A I can't remember their names.  I can't remember
22   the name offhand.
23 Q Is that something you'd have back at your office
24   in a file or somewhere?
25 A Yes.

Page 52

1 Q And by the way, you had agreed to bring your file
2   in this case today?
3 A Yes.
4 Q And is that what's sitting in front of you?
5 A Yes.
6 Q In a little bit, I want to just briefly -- I
7   don't want to bore the whole room, but I do want
8   to just thumb through it with you real quick and
9   see what's in there.
10     How did you get the cases from
11   Colorado; do you know?
12 A I was contacted, I don't know exactly how, they
13   heard about me, but I was contacted.
14 Q Could have been e-mail, could have been phone?
15 A Yeah, it was either e-mail or phone.
16 Q Do you have like a contact sheet, like an initial
17   contact sheet, something like that, that you use
18   in cases?
19 A No.  I mean, I start a file, that's what I do.
20 Q Had you had cases before these three in Colorado?
21 A Yes.
22 Q How many would you say?
23 A At least three.
24 Q Okay.  But none of those cases got to deposition
25   or at trial, right?

Page 53

1 A No.
2 Q The Hacienda that's involved in this case, the
3   Hacienda restaurant, have you been there?
4 A No.
5 Q Have you ever been to -- do you know what part of
6   town the Hacienda is on?
7 A I've looked at it on a map of Google, but I'm not
8   an expert in Denver geography.
9 Q If we were to look at a map now, would you be
10   able to say where in Denver this place was?
11 A No.
12 Q But you have seen some photographs of it, right?
13 A Yes.
14 Q And those photographs came from the attorneys so
15   I'm sure I must have them, right?
16 A Yes.
17 Q Were you contacted by the Seattle attorneys
18   originally?
19 A Yes.
20 Q And had you worked with them before?
21 A Yes.
22 Q How many times would you say?
23 A I think it's one of their -- only time.
24 Q And where was that case?
25 A I think it was in Seattle, but I don't recall

Page 54

1 exactly.
2 Q Okay. And have you worked with Mr. Laird's
3   firm --
4 A No.
5 Q -- as far as you know? I know it's hard to --
6   it's not a memory test, by the way, you know
7   that. So we're not expecting you to have perfect
8   memory.
9       What was the gist of the other case
10  that you worked on with the Seattle law firm?
11 A It was a slip and fall case, on ice.
12 Q Okay. Have you -- you said you've never been to
13  the Hacienda restaurant in Colorado. Have you
14  been to Colorado?
15 A Yes.
16 Q How many times have you been to Colorado?
17 A Oh, well, my dad lives there in Colorado Springs
18  so I go, you know, two or three times a year.
19 Q Okay.
20 A At least.
21 Q Is he an Air Force guy?
22 A Not anymore, but he's retired there.
23 Q I thought you made some mention of that earlier.
24 A He was in the Air Force in Viet Nam, yes.
25 Q And you said you born at an Air Force base?

Page 55

1 A Yes.
2 Q How does he like Colorado Springs?
3 A He loves it.
4 Q Yeah, it's beautiful up there. Have you ever
5   been -- besides -- so you've been to Colorado
6   Springs, your dad lives there. Have you ever
7   been to Colorado for business?
8 A Business, no, but I have been skiing there maybe
9   a number of times. I've been -- and I have gone
10  to the Rocky Mountain National Park and so I
11  have -- I've visited a number of times.
12 Q Okay. All right. But you've not gone for
13  purposes of your consulting business?
14 A No.
15 Q Or for purposes of Snowmen, Inc., trying to get
16  contracts to do work there or anything?
17 A No.
18 Q And in Colorado, you don't actually any equipment
19  or facilities or manpower to do work there, do
20  you?
21 A No.
22     MR. LASATER: I hate to do this, but
23  could we take just a quick little break?
24     MR. LAIRD: Yeah.
25     (Brief recess.)

Page 56

1 Q (By Mr. Lasater) I'd like to go through your
2   file real quick and see what you've got. Can
3   you show me what you brought along with you?
4 A Sure. There's my list of trial testimony,
5   depositions.
6 Q Okay. And then you have your report?
7 A Report. The weather report from WeatherWorks, a
8   copy of my notes.
9 Q By the way, before we start heading through this,
10  let me just stop you on this WeatherWorks report.
11  Are you familiar with that company, WeatherWorks?
12 A Yes.
13 Q And had you worked with them in the past?
14 A Yes.
15 Q And the individual that signed that, have you
16  worked with that person?
17 A Well, I mean, I've seen him do other reports, so
18  if you call that working with him, yes.
19 Q But you don't have any financial relationship
20  with WeatherWorks, do you?
21 A No.
22 Q How many times in the past have you relied on
23  data from WeatherWorks?
24 A I mean, probably seven or eight. I mean
25  different clients will hire them, they refer me.

Page 57

1   They also do expert work in the weather industry,
2   so, you know, probably eight or nine times.
3 Q Okay. So do you rely simply on the report that
4   they write or do you look at the data that they
5   provide with the report?
6 A I look at their report. I mean, they have the
7   very technical data that -- I'm not an expert in
8   deciphering all their data so I leave that up to
9   them because they're the experts so I just read
10  the report basically.
11 Q Do you recall the date on which the Plaintiff in
12  this case had his fall?
13 A I'd have to look at my notes. It was on
14  January 18, 2017.
15 Q Can you look at your -- the data that's provided
16  in the WeatherWorks information that they gave
17  you and are you able to tell when the ambient
18  temperature reached freezing that night?
19 A Yeah, around 9:00 p.m. on the 18th.
20 Q And is that the -- in terms of there being any
21  water on the parking lot, would the temperature
22  have to be below freezing for that water to
23  freeze?
24 A No, it doesn't have to be below freezing, not the
25  air temperature. The ground temperature is also

Case 1:17-cv-01307-CMA-MEH   Document 69-2   Filed 11/05/18   USDC Colorado   Page 11 of 20

Jeremy Swenson-10/9/2018
Matthew Pilatti vs. Hacienda II Partners, LLLP

Page 62

1  that it was just starting to switch over to
2  ice/black ice.
3  Q  Are you familiar with the reputation of Denver in
4  terms of how quickly weather changes and how
5  quickly snow disappears?
6  A  I am familiar that you have a high sun gradient
7  there and it does melt fast, yes.
8  Q  And have you heard that if you don't like the
9  weather, wait five minutes, have you ever heard
10  that phrase --
11  A  I've heard that phrase, yes.
12  Q  -- associated with Denver?
13  A  (Witness nods affirmatively.)
14  Q  Okay. So you don't actually know for a fact,
15  though, whether Mr. Pilatti tripped over his own
16  shoe laces or whether he slipped on ice, right?
17  A  Based on his testimony, he says that he slipped
18  on ice. He says after he fell, that he felt ice.
19  Q  Okay. But putting aside his testimony, you don't
20  know if he actually stumbled, tripped, slipped,
21  you don't know if ice was actually even involved,
22  do you?
23  A  It's my opinion that more likely than not ice was
24  involved.
25  Q  But you don't know that, right? I mean, he could

Page 63

1  have tripped on his shoe laces and suffered an
2  injury and you don't know that that's not true,
3  right?
4  A  It's possible.
5  Q  In that same vein, he could have slipped on maybe
6  a little bit of gravel, could have potentially --
7  there's a lot of things he could have slipped on
8  besides ice, right, you just don't know, right?
9  A  It's possible.
10  Q  In terms of -- going back to the parking lot and
11  ice formation, so you said sometime -- and
12  correct me if I'm wrong about this, but the data
13  that you're relying on, sometime between 9:00
14  o'clock and 10:00 o'clock at night, the ambient
15  air temperature got down to 32 degrees?
16  A  Yes.
17  Q  But you can't tell when between 9:00 o'clock and
18  10:00 o'clock that occurred, right?
19  A  No.
20  Q  And I don't know as of that stretch of time
21  whether the asphalt parking lot that had been
22  absorbing solar radiation all day long, you don't
23  know whether it's warmer or colder or the same as
24  the ambient temperature, right?
25      MR. LAIRD: Form and foundation.

Page 64

1  A  Correct. I do not know the exact temperature of
2  the parking lot during that day, no.
3  Q  (By Mr. Lasater) Okay. And if -- if snow
4  started melting off of let's say some of the
5  landscaped area, I think that's what
6  Mr. Pilatti was hypothesizing, and came into
7  the parking lot, do you know how long it would
8  take that water to freeze?
9      MR. LAIRD: Form and foundation.
10  A  I do not. It depends on the temperature of the
11  ground.
12  Q  (By Mr. Lasater) Okay. Could it take as
13  little as one minute, or would this just be
14  pure speculation for you?
15  A  That would be speculation as far as the exact
16  timing.
17  Q  Okay. In terms of Mr. Pilatti leaving the
18  restaurant, do you know what time that was?
19  A  I don't recall the exact time, no.
20  Q  Do you know if it was even possible for ice to
21  have formed as of the time he left the
22  restaurant, had there been snowmelt onto the
23  parking surface?
24  A  Well, it's my opinion that -- I mean, I know that
25  he was leaving the vicinity and fell so he was

Page 65

1  there. When did it begin to get icy, I don't
2  know the exact time. It's possible it could have
3  been icy between 8:00 and 9:00 p.m., it's
4  possible. I've seen ice form before -- when it's
5  36 degrees and the ground is cold.
6  Q  Is it possible that there was water that had come
7  from snowmelt let's say off the landscaped
8  portion of the parking lot and it came into the
9  parking lot and froze just minutes before he
10  encountered it?
11  A  That's possible.
12  Q  Okay. And as far as you know -- in fact, I don't
13  think you have any other information to suggest
14  that there was ice or snow in the actual parking
15  lot anywhere else besides this spot, right?
16      MR. LAIRD: Form and foundation.
17  A  I don't -- I don't know that. Based on the
18  testimony, there's no one saying that there was.
19  Q  (By Mr. Laird) Okay. And do you know how big
20  this patch of ice was that Mr. Pilatti claims
21  that he fell on?
22  A  It wasn't very big, I know that.
23  Q  Maybe 10 inches wide?
24  A  I don't know the exact dimensions of it, but I
25  know it was not a large area.

Case 1:17-cv-01307-CMA-MEH   Document 69-2   Filed 11/05/18   USDC Colorado   Page 12 of 20

Jeremy Swenson-10/9/2018
Matthew Pilatti vs. Hacienda II Partners, LLLP

Page 78

1 where he marked.
2 Q Oh, okay.
3 A It was in the -- in these photos. These were
4 just miscellaneous photos that were taken and
5 sent to me.
6 Q Would you consider those photos largely
7 irrelevant to your analysis, besides whichever
8 one might show the area that he fell?
9 A Yes. They were just to help me look at the
10 property and I mean, I don't consider them to be
11 significant, no.
12 Q I don't think, and you can correct me if I'm
13 wrong, but I don't think you commented on the
14 photos themselves in your report, did you?
15 A No.
16 Q And so did you find these of any use really in
17 coming up with your analysis?
18 A No. My analysis is pretty much just based on the
19 fact that it snowed 3.9 to 5.2 inches and there
20 was no type of work that was done in the parking
21 lot at all, there was no plowing, there was no
22 salting, there was no de-icing, which is highly
23 unusual, you know, for a commercial property to
24 do absolutely nothing, when there was a 3.9 to
25 5.2 inches of snow, they have no worked performed

Page 79

1 is not standard in the industry.
2 And so that if snow is sitting there
3 melting day after day, and then the temperatures
4 drop down below freezing, you know -- and that's
5 the other thing, when temperatures drop down
6 below freezing the day before, in the teens, if
7 there was slush, if there was water, that can
8 freeze into ice and it can freeze into thick ice
9 depending on how much moisture is there. And
10 even the next day, as it's starting to melt out,
11 it will melt -- it takes longer to melt that ice
12 down if there was ice there.
13 And then as the temperatures begin to
14 drop again, it can refreeze or may have even been
15 a portion of ice that was still there,
16 potentially.
17 Q So as far as you know, the afternoon of
18 January 18, 2017, when the Plaintiff and his
19 companions came in to the restaurant, as far as
20 you know, there wasn't any snow or ice at all
21 anywhere on the parking lot surface, correct?
22 A Well, I don't know that for sure, no.
23 Q But as far as know, there wasn't, right?
24 A Well, the testimony is is that it was mainly
25 clear. I do believe it was probably mainly

Page 80

1 clear, but there could have been ice left over
2 from the night before. I mean, if you have 3.9
3 to 5.2 inches of snow that's been sitting there
4 and just refreezing at night, I mean, that is the
5 question, you know, was -- was there ice left
6 there or not.
7 I think more likely than not there
8 could -- there was. You know, this would be a
9 complete different case if they would have plowed
10 the parking lot and salted the parking lot. Then
11 I would say there wouldn't -- more likely than
12 not, there probably would not be. But because no
13 work was performed, it just -- I believe there
14 was.
15 Q But as of January 18th, you don't know if any
16 work needed to be performed because you don't
17 know whether there was even one little speck of
18 ice or snow on that parking lot, right?
19 MR. LAIRD: Foundation.
20 A Well, I wasn't standing there, I didn't inspect
21 the entire parking lot. But based on the fact
22 that no work was done with 3.9 to 5.2 inches on
23 the 16th and then you have what happened the next
24 two days, I can, more likely than not, say that
25 there was at least moisture around or some form

Page 81

1 of ice that formed, in my opinion.
2 Q (By Mr. Lasater) Well, first of all, that snow
3 total that you're referring to, you don't
4 actually know if that was an accurate
5 measurement of any snow that existed on that
6 property on those dates, do you?
7 A Well, I'm basing that on WeatherWorks expert
8 report.
9 Q All right. And so in terms of the relevancy of
10 that snow being there two or three days earlier,
11 it wouldn't really have any relevance at all if
12 there wasn't any snow and ice on the parking lot
13 on the day that this guy fell, right,
14 Mr. Pilatti?
15 MR. LAIRD: Form and foundation.
16 A Well, that is the question, was there moisture,
17 was there -- was there ice. You know, I believe
18 based on the case file and based on the testimony
19 of Mr. Pilatti that more likely than not there
20 was probably something minor there. I don't
21 think it was something major, I think there was
22 something minor.
23 And then, you know, Hacienda did not
24 have any kind of -- their employees testified
25 that they didn't take care of the parking lot,

Case 1:17-cv-01307-CMA-MEH   Document 69-2   Filed 11/05/18   USDC Colorado   Page 13 of 20

Jeremy Swenson-10/9/2018
Matthew Pilatti vs. Hacienda II Partners, LLLP

Page 90

1  at some point and you can have customers or
2  pedestrians walking across it, then there needs
3  to be someone monitoring that.
4  Q  Okay. But only in situations where there's snow
5  or ice in the parking lot, right?
6  A  Well, there was definitely snow on the ground,
7  there was snow on the ground that was
8  melting/re-freezing, so snow can melt and come
9  off of medians. And then I'm still not convinced
10 that the parking lot was 100 percent free of snow
11 and ice at the time.
12 Q  How often would you say that someone would have
13 to patrol through the parking lot on a night like
14 this?
15 A  Well, the way that we would do it, and that would
16 be standard in the industry, that we would look
17 at the weather as the temperature is dropping.
18 There's many, many apps you can get nowadays.
19 You to go the National Weather Service, the
20 National Weather Service has it, and you can see
21 if the temperatures are scheduled to drop down
22 below freezing and they have an estimate of the
23 time.
24      And during the daytime, if you see
25 there's water or if there's areas that can

Page 91

1  refreeze, then you would make an effort to put
2  down de-icer in those areas before the
3  temperature drops below freezing.
4  Q  Okay, you said that's how we would do it. And by
5  "we," you're talking about you as a member of the
6  snow and ice remediation industry?
7  A  I would expect if you're going to take on -- if
8  you, as a property owner, are going to take on
9  the responsibility of snow and ice removal and
10 the ongoing snow and ice mitigation, which I
11 checked that they said they wanted to do, then
12 that would be their responsibility as well.
13 Q  But you're not here to give testimony on the
14 responsibilities of business owners and property
15 owners, right, only on issues concerning snow and
16 ice remediation from the area of your expertise?
17 A  Well, if they have chosen to take on the snow and
18 ice remediation services, then that is an area of
19 my expertise, because if a property owner decides
20 to take on snow and ice remediation services,
21 then that does fall under my expertise.
22 Q  Okay. So on this particular night then, how
23 often would you, if you were the owner of
24 Hacienda, how often would you inspect the parking
25 lot?

Page 92

1  A  Well, I would have had the parking plowed when
2  there was 3.9 to 5.2 inches of snow and then put
3  down a salt application afterwards, and then I
4  believe it would have dried everything up, and
5  if -- and then there wouldn't be an expectation
6  to look at and see is there melting coming off of
7  the islands; if there is, and temperature can
8  drop below freezing, there should have been
9  someone during the day before the temperature
10 dropped below freezing to put down de-icer on wet
11 areas or potential ice areas.
12 Q  Okay. But that doesn't really answer my
13 question. So as you said earlier, the witnesses
14 that have testified in this case, none of them
15 have said they saw snow and ice on the parking
16 lot surface prior to this guy falling, that day,
17 right?
18 A  Correct.
19 Q  And so given that the folks at Hacienda said that
20 the parking lot was nice and clear and nobody
21 sees snow and ice, just like the customers didn't
22 see snow and ice, how often would you expect them
23 to otherwise go out and venture through the
24 parking lot looking for snow or ice?
25     MR. LAIRD: Form and foundation.

Page 93

1  Q  (By Mr. Lasater) Or would you?
2  A  I believe it would be reasonable to have at least
3  one person that inspected the park lot before
4  dark or at dark, before the temperature got below
5  freezing, to see if there were any areas that
6  could refreeze into ice. And if they saw that,
7  to place the de-ice on the wet areas or the icy
8  areas if they existed.
9  Q  So other than that, it doesn't sound like you
10 would expect them to go out into the parking lot
11 like every ten minutes or every two hours, it
12 seems like that's not an expectation; is that
13 right?
14 A  Correct.
15 Q  And you're aware, aren't you, that the Plaintiff
16 himself said that he saw no snow or ice on the
17 parking lot when he came into the restaurant?
18 A  Yes. He saw it on the islands, we --
19 Q  Well, property owners don't generally plow
20 islands, though, right? I mean, that's not
21 uncommon to see snow and ice on the islands?
22 A  No.
23 Q  And in fact, you leave -- your company -- I say
24 "you" and I mean, you, and Snowmen, it's the
25 same, but you leave snow on the landscaped areas

Case 1:17-cv-01307-CMA-MEH Document 69-2 Filed 11/05/18 USDC Colorado Page 14 of 20

Jeremy Swenson-10/9/2018
Matthew Pilatti vs. Hacienda II Partners, LLLP

Page 98

1 removal, yes.
2 Q Businesses that have such plans, does that mean
3 they'll never have snow or ice on their parking
4 lots?
5 A No, I don't -- no, I don't agree with that. I
6 mean, there's basically two types of plans,
7 there's either a verbal plan or a written plan;
8 and in the industry, 0we recommend and believe
9 that written plans are better to have in place
10 than a verbal plan. Hacienda did not have any
11 type of written plan, they had a verbal plan
12 and --
13 Q And you believe that the written plans are
14 better?
15 A I do. I think the written plans are better than
16 the oral. It just shows that you're more
17 organized, you're more professional, you've
18 thought through exactly who is going to do what,
19 you've outlined the responsibilities, you're
20 outlined, you know, who is going to do what when.
21 I mean, the more detailed you get, the better it
22 is.
23 Q Okay. The fact that a business owner has a
24 verbal plan versus a written plan doesn't, per
25 se, mean they're an unreasonable business owner,

Page 99

1 does it?
2 A No.
3 Q And some businesses, as far as you know, do a
4 very good job with snow and ice remediation just
5 by way of a verbal plan, right?
6 A Yes, it is possible to do good snow and ice
7 removal with a verbal plan.
8 Q And as far as you know, Hacienda in Colorado has
9 done a great job with their verbal plan over the
10 years in terms of snow and ice remediation,
11 right?
12 MR. LAIRD: Form, foundation.
13 A Well --
14 Q (By Mr. Lasater) In relation to people getting
15 injured or potential --
16 A Well, that's kind of a multilayered question. I
17 do believe, from what I've seen, that they have
18 done a reasonable job on the sidewalks it
19 appears. But by not addressing the parking lot,
20 I don't believe it was reasonable.
21 They -- because I mean, they stated
22 that, you know, anyone there at the restaurant
23 had the ability to call -- any manager had the
24 ability to call Emerald Isle Landscaping, that
25 was part of their verbal plan, but nobody called

Page 100

1 the Emerald Isle Landscaping.
2 The verbal plan was to call Emerald
3 Isle if there was -- they were supposed to come
4 out if there was two or more inches of snow.
5 There was obviously more two or more inches of
6 snow and yet Emerald Isle didn't come out and
7 nobody called them.
8 So, you know, when you have verbal
9 plans and a lot of times there are breakdowns
10 where somebody thinks that somebody else is doing
11 something and there's not really anybody in
12 charge, and so I just -- I don't think they did a
13 reasonable job with the parking lot.
14 Q Well --
15 A On the verbal plan.
16 Q In terms of a two-decade history of no one ever
17 getting injured in the parking lot, they did a
18 pretty good job with that, didn't they?
19 MR. LAIRD: Foundation.
20 A Yeah, I don't -- I don't know, you know, how many
21 decades you go. You know, to me, things happen
22 and when they happen, it would have been good for
23 them to have a plan, a better plan.
24 Q (By Mr. Lasater) Do you happen to know --
25 well, first of all, the Emerald Isle contract,

Page 101

1 that seemed to be -- you said it might not be
2 the most well worded contract you've ever seen,
3 but that's still a pretty industry standard
4 contract, isn't it?
5 A Yes.
6 Q And the automatic show-up, as we called it,
7 automatic show-up provision, where it says if it
8 snows two or mow inches, you show and plow, that
9 seems to be pretty industry standard in the
10 Denver metro area, isn't it?
11 A It is a standard trigger depth, yes.
12 Q Do you happen to know why Emerald Isle didn't
13 show up to plow if there was two or more inches
14 in the preceding days?
15 A I do not.
16 Q Have you ever asked anybody, to try to figure
17 that out?
18 A No.
19 Q Even if Hacienda Colorado had a written plan,
20 it's still possible that this little bit of ice
21 could have -- or, rather, I guess water, let's
22 call it snowmelt that turned into ice, could have
23 gotten by them and Mr. Pilatti would have fallen
24 anyway, right, even if they had a reasonable
25 written plan?

Case 1:17-cv-01307-CMA-MEH Document 69-2 Filed 11/05/18 USDC Colorado Page 15 of 20

Jeremy Swenson-10/9/2018
Matthew Pilatti vs. Hacienda II Partners, LLLP

Page 106

1 the lawyers?
2     MR. LAIRD: Object, it's not
3 discoverable.
4 A I do not.
5 Q (By Mr. Lasater) Does it exist as far as you
6 know?
7 A No.
8 Q And what would you have done with it, just put it
9 in the waste bin or shredder?
10 A I revise -- my report is electronic so I revise
11 them electronically and then save them.
12 Q Okay. So you would just save over your prior
13 work?
14 A Yes.
15 Q And you produced and we've received e-mails and
16 correspondence between you and the attorneys.
17 How would the report editing have gone, by phone
18 pretty much, or --
19     MR. LAIRD: Just object to all these
20 questions regarding drafts.
21 A Yes, we would have -- we would have called and
22 discussed it on the phone and then I would have
23 edited it or made changes or saved it.
24 Q But as of today, you'd have no way to go back to
25 your original draft and compare it to your final

Page 107

1 draft, right?
2 A Correct.
3 Q Do you believe that any amount of ice would have
4 been acceptable amount on the parking lot at
5 Hacienda on January 18, 2017?
6 A I don't believe that there's any way you can
7 totally eliminate all ice from the parking lot,
8 no.
9 Q So the answer is: Yes, there would be an
10 acceptable amount of ice on that parking lot?
11 A Well, my answer is is that I don't believe that
12 you can effectively remove a hundred percent of
13 all snow and ice from a parking lot in the
14 wintertime.
15 Q I'm assuming you've not seen a photograph of the
16 parking lot on January 18, 2017?
17 A No.
18 Q Have you ever seen a photo of the parking lot on
19 any other date when it had snow or ice on it?
20 A No. Not the parking lot, no.
21 Q Do you do any advertising specifically towards
22 lawyers that represent plaintiffs in injury
23 cases?
24 A No.
25 Q You don't like set up a booth at any conferences

Page 108

1 or put any ads in their magazines?
2 A No. I advertise in the expert witness
3 directories which are used by all attorneys.
4 Q Do you know the names of those directories?
5 A One is SEAK, S-E-A-K, experts.com; ALM Experts.
6 There might be one or two more. Those are the
7 ones I can think of right offhand.
8 Q And do you have to pay for those?
9 A Yes.
10 Q Do you know roughly what that costs you?
11 A Usually $500 to $1,000 year.
12 Q And how many do you belong to?
13 A Four or five.
14 Q So that budgets what, roughly $5- to maybe $8,000
15 a year?
16 A Yes.
17 Q In your industry, the snow and ice remediation
18 industry, are you familiar with the term "zero
19 tolerance"?
20 A Yes.
21 Q What does mean, what does zero tolerance mean?
22 A Zero tolerance is a term that is used with
23 customers and property owners who wish to have as
24 little snow and ice in the parking lot at all
25 times.

Page 109

1 Q Okay. In terms of zero tolerance, you don't
2 believe that's a realistic or reasonable property
3 condition, do you?
4 A Well, it depends on what you consider realistic
5 or reasonable. I mean, it's just a term that
6 describes the level of service that you give to a
7 property for snow and ice removal.
8 Q Okay. But you don't believe that having a zero
9 tolerance -- or I guess it's called a zero
10 tolerance condition, you don't believe that
11 that's necessarily reasonable for business owners
12 to have that, right? I'm not sure that was a
13 good question.
14 A Yeah, I'm not sure I quite --
15 Q Let me just start over with that question.
16     Hold on a second. Sometimes I ask
17 questions I think I back through and if it
18 doesn't make sense to me, it doesn't make sense
19 to you.
20     Okay. In terms of zero tolerance, you
21 agree that you are always going to have some form
22 of snow and ice on commercial property, right, if
23 it's in a snow and ice zone, like Denver?
24 A Well, depends on the time, I mean, how many days
25 after an event. I mean, I do believe it is --

Case 1:17-cv-01307-CMA-MEH   Document 69-2   Filed 11/05/18   USDC Colorado   Page 16 of 20

Jeremy Swenson-10/9/2018
Matthew Pilatti vs. Hacienda II Partners, LLLP

Page 118

1  fell on that parking lot two or three days
2  earlier, do you?
3  A  Well, based on the weather report, I mean, I'm
4  basing it on what the WeatherWorks people say.
5  Q  Okay. All right. And you don't have any other
6  information as to the snowfall on this exact
7  location other than what's in the WeatherWorks,
8  right?
9  A  True.
10 Q  And in terms of your statement that by not
11 plowing that created a condition for snow to
12 melt, and then I guess refreeze so that
13 Mr. Pilatti could fall on it, right?
14 A  Yes.
15 Q  So as far as -- as far as you know, though,
16 having the plow people come out two to three days
17 earlier and address that snowfall, that may have
18 had absolutely zero to do with Mr. Pilatti
19 falling, right, the fact that they didn't come?
20 A  Well, I'm not convinced of that. Hacienda didn't
21 call them. I mean, if it snowed 3.9 to 5.2
22 inches and it dropped down to 23 to 25 degrees,
23 there would be freezing in the parking lot.
24    And then on the 17th, it got up to 46,
25 47 and then dropped down to 17, 19, it's my

Page 119

1  personal opinion that if you had four to five
2  inches of snow and then at nighttime it was
3  dropping below freezing, that you would have
4  refreezing into ice and icy conditions, and that
5  that could have continued on to the 18th and been
6  a part of the problem with ice.
7  Q  Okay. Well, if Hacienda had plowed the parking
8  lot two or three days earlier, a good part of
9  that snow would have ended up in the grassy
10 median, wouldn't it have?
11 A  Yes.
12 Q  And so there may have been, as of the 18th, there
13 may have been more snow on the grassy medians
14 than there actually was by virtue of the plowing
15 that had occurred two or three days earlier;
16 isn't that true?
17 A  Yes. There would probably be some piles, yes.
18 Q  And there would be more potential for snowmelt to
19 come off the landscaped areas than there was on
20 January 18th had it been plowed on January 15th,
21 right?
22 A  Well, I don't know if there would have been more.
23 I mean, there was still snow on the ground as per
24 the weather report, so there certainly would have
25 been bigger piles, but there would have been

Page 120

1  melting or freezing, yes, which is -- the second
2  part of what I said, I mean, Hacienda did not
3  have a good plan in place for inspections or
4  looking in the parking lot for melting or
5  freezing either.
6  Q  So let's just stay on the first point, which is
7  the point about them not having the parking lot
8  plowed for days earlier. You know that
9  Mr. Pilatti, in at least in his deposition,
10 speculated that the ice that he feels he slipped
11 on came from snow melting off of the grassy
12 median and running into the parking lot and then
13 freezing, you know that, right?
14 A  That's his opinion, yes.
15 Q  And do you have any reason to believe that that
16 is not what happened?
17 A  Well, I'm looking at the weather data and what
18 didn't happen as a snow professional, I think it
19 could have come from the median or it could have
20 been left over in the parking lot due to the fact
21 it wasn't plowed, it could be either one or a
22 combination of both.
23 Q  But you do know that Mr. Pilatti himself said
24 that as he entered the restaurant, he didn't see
25 any snow or ice at all, you know that, right?

Page 121

1  A  Yes. And I do believe that probably the majority
2  of the parking lot was clear.
3  Q  Well, let's just -- let's just go with
4  Mr. Pilatti's version of what he speculates
5  happened, and that is snow melted off of the
6  landscaped areas and into the parking lot and
7  then froze at some point during the night. Let's
8  stick with that.
9     If that's the case, then the fact that
10 that parking lot wasn't plowed during the
11 snowfall two or three days earlier would have
12 nothing to do with his fall, would it?
13    MR. LAIRD:  Form and foundation.
14 A  Well, I don't -- I don't think Pilatti was
15 thinking through the past weather and he didn't
16 know the parking lot hadn't been plowed, so he
17 was just coming up with his own analysis of what
18 he thinks may have happened, but, you know,
19 technically, it's possible.
20 Q  (By Mr. Lasater) Okay. So technically, if
21 he's right, then not plowing the parking lot
22 two or three days earlier would not have
23 contributed to his fall, okay, if he's right?
24    MR. LAIRD:  Form and foundation.
25 A  I think it's still a possible more likely than

Case 1:17-cv-01307-CMA-MEH   Document 69-2   Filed 11/05/18   USDC Colorado   Page 17 of 20

Jeremy Swenson-10/9/2018
Matthew Pilatti vs. Hacienda II Partners, LLLP

Page 122

1  not that it was a possible contribution to
2  moisture being there.  That's my personal
3  opinion.
4  Q  (By Mr. Lasater) Okay.  It would have -- let
5     me just ask it again because I'm not sure I
6     understood the answer.
7        If Mr. Pilatti is right and snow melted
8     off of the grassy median and it ran into the
9     parking lot a little bit, and not very much
10    according to his own description, and it froze,
11    and that's what he slipped on, then that would
12    have nothing to do with Hacienda not plowing that
13    lot two or three days earlier, right?
14        MR. LAIRD:  Form and foundation.
15 A  Well, if you believe just Pilatti who is not a
16    snow expert and if you just analyze just his
17    testimony on that, then I would agree with you,
18    but I'm looking at the weather and I'm looking at
19    other factors.
20 Q  (By Mr. Lasater) I understand.  But you said
21    you agree with me if that's what happened, if
22    his version is true, right?
23 A  Well --
24        MR. LAIRD:  Objection, foundation.
25 A  -- I believe that Pilatti didn't know all of

Page 123

1  the -- all of the past -- he didn't know the
2  total snow amounts.  I mean, I don't know he
3  took -- I don't think he took all of that into
4  account.
5  Q  (By Mr. Lasater) But let's just say that he
6     was accurate, you are agreeing with me that
7     that would mean then that the lack of plowing
8     two or three days earlier did not contribute to
9     his fall?
10        MR. LAIRD:  Foundation.
11 Q  (By Mr. Lasater) Correct?
12 A  I just don't know if I totally agree with that,
13    but I'll -- I don't think -- I mean, I think it
14    could have been coming from the islands or it
15    could have been left over from the not plowing,
16    that's my personal opinion.
17 Q  And if it came from the islands, that would not
18    be related to them not plowing two or three days
19    earlier, right?
20 A  If it came strictly from the islands, it's
21    possible.
22 Q  What's possible?
23 A  If -- if, theoretically speaking, there was only
24    snow on the islands and if, theoretically
25    speaking, all the snow had melted in the parking

Page 124

1  lot because of not plowing, then that would be
2  true.
3  Q  Okay.  Thank you.  Do you think that had they
4     plowed and had they piled more snow than there
5     was onto those grassy medians that there would
6     have been more potential for let's call it runoff
7     and ice formation had they plowed and had they
8     placed the plowed snow on the grassy medians?
9  A  It really would have depended probably on where
10    they placed the snow.
11 Q  Fair enough.  Okay.  I think I've -- the other
12    part of that I've already asked you about, and
13    that was the lack of written snow remediation
14    plan.  You said verbal plans can be as good as --
15    or no, you said verbal plans are not as good as
16    written plans, right, but can still be -- can
17    still be effective?
18 A  Right.  I have seen quality snow and ice removal
19    services happen with verbal plans.  But overall,
20    written plans in the industry are considered to
21    be better and just -- it's just an accurate
22    reflection of when I find people with written
23    plans, they usually are more planned, they've
24    usually thought things out, they've got systems
25    in place, and it's just an overall better system

Page 125

1  than having a straight verbal plan.
2  Q  Okay.  But you can't sit here today and say that
3     Hacienda having a lack of a written plan versus a
4     verbal plan caused Mr. Pilatti's fall, can you?
5  A  No.
6        MR. LASATER:  That's all I have.
7        MR. LAIRD:  I just have a few
8     questions.
9            EXAMINATION
10 BY MR. LAIRD:
11 Q  So you would defer -- there's been a lot of
12    discussion about what Matthew Pilatti testified
13    to and what he didn't testify to.  You would
14    defer to what he actually testified to and
15    recorded in the transcript, correct?
16 A  Yes.
17 Q  There's been discussion about this snow -- or,
18    excuse me, this piece of ice being ten inches
19    wide.  If Mr. Pilatti said that it was at least
20    10 to 18 inches and could have been 10 to 12 feet
21    the other way, that would be -- you would defer
22    to that, correct?
23 A  Yes.
24 Q  You were asked questions about whether or not a
25    certain amount of snow or ice was acceptable on a

Jeremy Swenson-10/9/2018
Matthew Pilatti vs. Hacienda II Partners, LLLP

Page 126

1  parking lot. Do you recall that?
2  A  Yes.
3  Q  That certain amount, I would assume, depend --
4     depends on the size of -- or how much snow and
5     ice is in the parking lot, correct?
6  A  Yes, it would depend on that. It would depend on
7     temperatures. It would depend on how many days
8     after the actual precipitation happened. There's
9     a number of factors.
10 Q  So if we're talking about a 10 inch by 10 inch
11    piece of ice, that's different than a 18-inch by
12    12-foot piece of ice, correct?
13 A  Yes.
14 Q  Now, you also were just kind of -- there was some
15    questions about what it is that you're critical
16    of Hacienda and what you're not critical of
17    Hacienda, do you recall that, in terms whatever
18    they did and how they responded?
19 A  Yes.
20 Q  You are critical that they did not identify
21    potential areas of melting and refreezing,
22    correct?
23 A  Yes.
24 Q  So one of the -- one of the things that you're
25    critical of is that they did not go out and look

Page 127

1     for areas where there was thawing and that
2     potentially that thawing could refreeze, correct?
3  A  Yes.
4  Q  And you -- if they had gone out and identified
5     those places, what is it that you believe they
6     should have done?
7  A  I believe if they had identified wet areas or icy
8     areas and the temperature was going to drop below
9     freezing, that they should have applied ice melt,
10    and there was even testimony that they would
11    potentially do that if they saw it.
12 Q  So you're not expecting that they would go out
13    and check this every ten minutes or 30 minutes or
14    even every hour, correct?
15 A  No.
16 Q  You were just expecting that they would identify
17    an area of thaw and where it might refreeze and
18    throw some ice on top of it -- or de-ice,
19    correct?
20 A  Yes, it would be reasonable to do that one time
21    per day, based on the current temperatures in
22    this case.
23 Q  Now, there was questions about whether or not you
24    had been qualified to be an expert previously; do
25    you recall that?

Page 128

1  A  Yes.
2  Q  In those times that you have testified, you were
3     allowed to talk about your expertise, correct?
4  A  Yes.
5  Q  So you're not sure whether or not the judge said
6     that you could -- that you were qualified as an
7     expert but you were allowed to testify as to your
8     expertise, right?
9  A  Yes.
10 Q  You were allowed to talk about the standard of
11    care, correct?
12 A  Yes.
13 Q  And you were asked questions about whether or not
14    what a company had done was reasonable and not
15    reasonable and you were allowed to testify about
16    that, correct?
17 A  Yes.
18 Q  And you would also defer to what is actually in
19    the transcript of Mr. Pilatti's deposition as to
20    whether or not he believes the snow or the ice
21    melt came from the median or if it came from
22    somewhere else in the parking lot, correct?
23 A  Yes.
24 Q  It's your opinion today as someone who has been
25    in the snow and ice mitigation business since

Page 129

1     1995, that it is more likely than not that the
2     snow -- or, excuse me, that the moisture could
3     have come from either the median or somewhere
4     else in the parking lot, correct?
5  A  Yes.
6  Q  And it's your testimony today, again based upon
7     your 20 plus years of addressing snow and ice in
8     parking lots in commercial -- or on commercial
9     properties, that it's more likely than not that
10    the ice could have formed prior to 9:00 p.m. on
11    January 18, 2017, correct?
12 A  Yes, somewhere around that time frame.
13 Q  Did you see in the depositions where the managers
14    at Hacienda assumed responsibility for snow and
15    ice remediation/mitigation when Emerald Isle was
16    not performing those duties with them?
17 A  Yes, that was marked in the contract.
18 Q  And you saw where they acknowledged in their
19    depositions that they actually assumed that
20    responsibility, correct?
21 A  Yes.
22 Q  As part of your business for the last 20 plus
23    years doing snow and ice mitigation and
24    remediation, you've had to monitor the
25    temperature, correct?

Case 1:17-cv-01307-CMA-MEH Document 69-2 Filed 11/05/18 USDC Colorado Page 19 of 20

Jeremy Swenson-10/9/2018
Matthew Pilatti vs. Hacienda II Partners, LLLP

Page 130

1 A Yes.
2 Q You've had to monitor the weather, correct?
3 A Yes.
4 Q You've had to monitor the conditions, you know,
5 the environmental conditions, correct?
6 A Yes.
7 Q You're familiar with ground temperature versus
8 ambient temperature, correct?
9 A Yes.
10 Q Okay. You've had to monitor snowfall amounts,
11 correct?
12 A Yes.
13 Q You've had to monitor wind or wind conditions, I
14 assume?
15 A Yes.
16 Q Okay. You've also had to monitor what time the
17 sun goes down and how that impacts when and where
18 you're supposed to apply snow and ice mitigation,
19 correct?
20 A Yes.
21 Q And based upon all of that, again, it's your
22 testimony, it's your belief that it's more likely
23 than not that there was ice as of 9:00 p.m. in
24 the Hacienda Colorado parking lot on January 18,
25 2017, correct?

Page 131

1 A Yes.
2 Q There was -- you've, in your review, you saw some
3 of the -- some of the discovery responses, did
4 you see that, from Hacienda? Do you recall
5 seeing that?
6 A Yes.
7 Q And do you recall where they said that they
8 didn't believe that there was any major snow
9 event in the few days prior to January 18, 2017?
10 A Yes.
11 Q And that's contradicted by what is in the
12 WeatherWorks report, correct?
13 A Yes.
14 Q And that's also contradicted by what they
15 actually put in their operational logs, correct?
16 A Yes, their logs indicated that they had to let
17 people go early and that there was snow.
18 Q And that is on January -- on that Monday, right,
19 so January 16?
20 A Yes.
21 Q Which is what lines up with the WeatherWorks,
22 correct?
23 A Yes.
24 Q And that's also corroborated by what Mr. Pilatti
25 testified to, correct?

Page 132

1 A Yes.
2 Q And you saw that Mr. Pilatti testified that he
3 saw snow throughout the medians, correct?
4 A Yes.
5 Q Okay. Is it your opinion -- I think you already
6 touched on this, but is it your opinion that
7 given the conditions, that some of that snow in
8 the median could have melted and then refroze in
9 the parking lot around 9:00 p.m. on January 18th,
10 2017?
11 A Yes, that's my opinion.
12       MR. LAIRD: I don't have any further
13 questions.
14       FURTHER EXAMINATION
15 BY MR. LASATER:
16 Q Isn't that the opinion you took issue with me on
17 right before we finished talking, the fact that
18 the snow could have come off the grassy median or
19 melted off the grassy median and formed ice?
20 Isn't that what you said, Mr. Pilatti isn't an
21 expert and doesn't know this and has --
22       MR. LAIRD: Form and foundation, I
23 think misstates his testimony.
24 A I believe I said that I don't think Pilatti was
25 taking into account the fact that there could

Page 133

1 also be snow sitting in the parking lot from no
2 one plowing or salting, but I don't believe I
3 said it couldn't come from the median. I think
4 my testimony is is that I believe it came -- was
5 a combination of both.
6 Q (By Mr. Lasater) All right. So we do know
7 that people said that there was ice -- or,
8 rather, snow in the medians, but nobody said
9 there was snow anywhere else in the parking lot
10 that evening that he fell. Are you aware of
11 information that maybe I'm not aware of?
12 A No. I don't recall any testimony of any snow,
13 no.
14 Q So that's just speculation on your part that
15 there's snow left over in the parking lot,
16 right --
17 A Well --
18 Q -- as of January the 18th at 9:00 o'clock?
19 A Or potential ice, yeah, or the remains of it,
20 yes, that's my opinion, that is speculation, yes.
21 Q And the reference to the size of the ice being 10
22 to maybe 18 inches versus -- in width I guess,
23 and then maybe 12 feet in length, do you happen
24 to know if there actually was such an ice
25 accumulation, do you happen to know how much of

Page 134

1 that 12 feet would have been under a car?
2 A I do not.
3 MR. LASATER: That's all I've got. You
4 good?
5 MR. LAIRD: Yeah.
6 FURTHER EXAMINATION
7 BY MR. LAIRD:
8 Q Well, I just want to follow up. So you --
9 Mr. Lasater asked you whether or not that's
10 speculation about whether or not there was snow
11 in the parking lot or snow and ice remaining
12 somewhere in the parking lot outside of the
13 medians. Do you recall that question?
14 A Yes.
15 Q Okay. So you agree that it was speculation, but
16 why -- what do you -- what do you base that on?
17 Is there something that you actually base that on
18 or are you purely speculating without any reason
19 for stating that?
20 A I'm basing it on the WeatherWorks report. I
21 mean, based on my experience in the snow and ice
22 removal industry, if it snowed 3.9 to 5.2 inches
23 on the 16th, and then the evening it dropped down
24 to 23, 25 degrees, there's a potential that you
25 could have -- I mean, and no one plowed the

Page 135

1 parking lot and no one salted the parking lot and
2 no work was done, there would have been deep
3 snow, cars would have been running over it, it
4 would have been getting smashed, compacted; when
5 that happens, it can freeze into -- you would
6 have freezing into thick ice.
7 I mean, when cars run over 3.9 to 5.2
8 inches of snow, you compact and then it can
9 freeze at 23 to 25 degrees.
10 The next day it warms up to 46, 47,
11 you'll have melting/refreezing, but then, I mean,
12 if you have three -- I mean, based on my
13 experience, 3.9 to 5.2 inches if compacted snow,
14 now you drop down, I mean, it starts to melt
15 during the day, then at the nighttime on the
16 17th, 17 to 19 degrees is very cold, it will
17 refreeze into solid ice. And then, you know, the
18 next day it gets up into the 50s, and I'm just
19 saying based on the amount of snow and no work
20 being performed in the parking lot, to me, it's
21 very reasonable that there was some form of ice
22 still left, moisture/ice left in the parking lot,
23 snow, ice, moisture, left on the 18th, that could
24 have still been there and was part of the
25 incident, the cause of the incident.

Page 136

1 Q You're saying that that's more likely than not?
2 A Yes.
3 FURTHER EXAMINATION
4 BY MR. LASATER:
5 Q But you're still speculating, right, because we
6 know there wasn't deep compacted snow on that
7 parking lot on the evening that Mr. Pilatti fell,
8 don't we know that?
9 A There would have been the day before.
10 MR. LAIRD: Foundation.
11 Q (By Mr. Lasater) But not the day of, was
12 there? I mean, nobody said that as a --
13 MR. LAIRD: Foundation.
14 A There's not testimony of that, no.
15 Q (By Mr. Lasater) And not only is there no
16 testimony, there's just no evidence of it,
17 there's no pictures, there's nothing that says
18 there was compacted snow on the parking lot,
19 right?
20 A No, but there would have been compacted snow if
21 cars were there and you had said hundreds of
22 people were driving over it every day and nobody
23 did anything in the parking lot, there would have
24 been just a slushy, smashed up mess of compacted
25 snow leading up to that point.

Page 137

1 Q Unless it did what snow does in Denver and that's
2 go away after a couple of days, right?
3 MR. LAIRD: Form and foundation,
4 argumentative.
5 A I do believe it was melting, I do believe that.
6 MR. LASATER: Okay. I think we're
7 done.
8 THE WITNESS: I'd like to review and
9 sign.
10 (Deposition concluded at 1:15 p.m.)