1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CIVIL ACTION NO. 17-cv-01308-MEH

_____

DEPOSITION OF MATTHEW G. PILATTI
EXAMINATION DATE:  APRIL 12, 2018

_____

MATTHEW PILATTI, an individual,
Plaintiff,
v.
HACIENDA II PARTNERS, LLLP; and EMERALD ISLE
LANDSCAPING, INC., a Colorado corporation,

Defendant.

_____

        PURSUANT TO NOTICE, the deposition of
MATTHEW G. PILATTI was taken at 9:53 a.m. on April 12,
2018, at 50 South Steele Street, Suite 450, Denver,
Colorado, before Nathan Stormo, Registered Professional
Reporter and Notary Public in and for the State of
Colorado, said deposition being taken pursuant to the
Federal Rules of Civil Procedure.


                    Nathan Stormo
            Registered Professional Reporter

EXHIBIT C

                                                                    2
                        A P P E A R A N C E S
    For the Plaintiff:
       MATTHEW R. LAIRD, ESQ.
       Thomas Keel & Laird, LLC
       50 South Steele Street, Suite 450
       Denver, Colorado  80209
       (303) 372-6130
    For Hacienda II Partners, LLLP:
       KATY BRIM, ESQ.
       Lasater & Martin, P.C.
       8822 South Ridgeline Boulevard, Suite 405
       Highlands Ranch, Colorado  80129
       (303) 730-3900
    For Emerald Isle Landscaping, Inc.:
       DAVID M. BOST, ESQ.
       Overturf McGath & Hull P.C.
       625 East 16th Avenue
       Denver, Colorado  80304
       (303) 860-2848

    Also Present:  None


                            I N D E X
    EXAMINATION BY                                              PAGE
     Ms. Brim  . . . . . . . . . . . . . . . . . . .              4
     Mr. Bost  . . . . . . . . . . . . . . . . . . .            159
     Ms. Brim  . . . . . . . . . . . . . . . . . . .            190
     Mr. Laird . . . . . . . . . . . . . . . . . . .            197


                          E X H I B I T S

      NO.          DESCRIPTION                                  PAGE

       1    Google Maps aerial photograph with
            markings by Mr. Pilatti . . . . . . . .              29
       2    Photograph  . . . . . . . . . . . . . .              40
       3    Color Photographs . . . . . . . . . . .              57

3

```
 4    Plaintiff's Initial Disclosures
      Pursuant to Fed.R.Civ.P. 26(a)(1) . .     73

 5    Black and white aerial photo . . . .      78

 6    4/27 and 6/8/2017 medical records
      from Dr. Carlson regarding
      Mr. Pilatti . . . . . . . . . . . . .     96

 7    6/28/17 record from Advance Physical
      Therapy of Orting regarding
      Mr. Pilatti . . . . . . . . . . . . .    101

 8    7/14/2017 record from Advance
      Physical Therapy regarding
      Mr. Pilatti . . . . . . . . . . . . .    107

 9    7/24/2017 record from Advance
      Physical Therapy regarding
      Mr. Pilatti . . . . . . . . . . . . .    114

10    Two Twitter pages . . . . . . . . . .    140

11    Facebook messages . . . . . . . . . .    151

12    Form regarding Mr. Pilatti, not
      filled out . . . . . . . . . . . . .     154
13    Report of Accident (Workplace Injury,
      Accident, or Occupational Disease)
      regarding Mr. Pilatti . . . . . . . .    154
```

20

1  Q   Okay. What time did the meetings end on the
2  day of the incident?
3      A   I'm not exactly positive, but to the best of my
4  memory, between 4:00 and 5:00.
5      Q   And while you were at the meetings that day,
6  did you stay inside all day, or did you go out to lunch;
7  anything like that?
8      A   We were inside all day.
9      Q   Okay. Do you recall what the weather was like
10 that day?
11     A   It was sunny, spotty. A little bit of clouds,
12 but --
13     Q   So to your knowledge, it did not snow at all,
14 at least where you were, on the day of the incident?
15     A   Not on that day, no, it did not.
16     Q   What do you recall about the weather on the
17 Tuesday when you arrived in Denver?
18     A   The weather was similar on that day to
19 Wednesday, if I remember. But people informed me that
20 it had just snowed the previous day, and I seemed to
21 have missed that on flying in.
22     Q   Who informed you of that?
23     A   My coworkers and peers here and the people from
24 Colorado.
25     Q   Had some of your coworkers arrived in Denver on

21

1  Monday that week?
2      A   There were people already here, but no one from
3  Seattle.
4      Q   Okay. But Denver people were already here?
5      A   Yes.
6      Q   Okay. Is that who told you that it had just
7  snowed?
8      A   I want to say it was -- I'm trying to remember.
9  I think it was Chris Longo, who is one of my -- who was
10 Sarah's boss at the time, said something like, Oh, you
11 missed it, the snow. It just snowed yesterday or
12 something like that. Because I made a comment about I
13 expected snow.
14     Q   Okay. Do you recall seeing snow on the ground
15 and noticing that it looked like it had just snowed when
16 you arrived in Denver?
17     A   Yes. There was snow, not on like the roads,
18 but on all the grass area around Denver.
19     Q   Okay. And people were telling you it had
20 snowed on Monday, not on Tuesday morning while you were
21 in flight?
22     A   Yes. I recall somebody saying that it had
23 snowed.
24     Q   On Monday?
25     A   Yes. You know, honestly, it may have been

22

1  Monday on our conference call I think is when it came
2  up; somebody on the conference call. Because Monday is
3  our day for conference calls. Somebody said it snowed
4  today or something like that. Because we said we were
5  coming, and I had mentioned snow.
6      Q   And that would have been somebody who was in
7  Denver?
8      A   Yes.
9      Q   So you, of course, don't know where it may have
10 snowed in Denver on Monday?
11     A   Correct.
12     Q   Did you have a rental car while you were in
13 Denver?
14     A   I did not.
15     Q   And it's my understanding that you were walking
16 to your vehicle at the time of the incident?
17     A   Yes, ma'am.
18     Q   So what vehicle was that?
19     A   We did have a rental car. It wasn't checked
20 out by me, and it was already rented prior to my
21 arrival. It was a -- like a Chevy Tahoe; some big SUV
22 that was a rental for the people there for the meetings.
23 There were also people in town from northern California,
24 and then one other person from Seattle as well.
25     Q   What did you do after the meetings ended on the

23

1  day of the incident?
2      A   We headed to the restaurant.
3      Q   Did you go to the restaurant straight from the
4  meeting location, or did you go back to the hotel first?
5      A   You know, I can't be 100 percent sure. I would
6  assume we stopped back by the hotels before heading out
7  there. But, you know what? I can't be sure. Again, I
8  vaguely remember we might have went straight there. I
9  would have to go back or ask somebody.
10     Q   Okay. You said you had dinner -- or did you
11 have dinner in Denver on Tuesday night when you flew in?
12     A   I think we just ate at the hotel.
13     Q   Okay.
14     A   But I also don't exactly recall.
15     Q   So you would have gone from the airport to the
16 hotel?
17     A   I didn't get to go to the hotel because my
18 flight was late, so I went from the airport straight to
19 the meetings.
20     Q   Okay. So from the airport straight to the
21 meetings, and then on Tuesday from the meetings back to
22 your hotel that night?
23     A   I went from the airport to the meetings to the
24 hotel, and then the next day to the meetings, then I
25 believe to the hotel and then to the restaurant. But we

```
                                                   28                                                     30
 1   prior to us walking out there, and that's probably why I    1        MS. BRIM:  That would be helpful.  Thanks.
 2   didn't list her.  These are the people that were            2        Q   (By Ms. Brim)  Did you drive to the restaurant?
 3   remaining there when the incident occurred.  And I          3        A   I did not.
 4   actually believe that Gareth had just pulled out in his     4        MR. BOST:  No, I don't.  I have a red pen.
 5   own vehicle prior to me falling as well.                    5        MS. BRIM:  That might help, but I think we're
 6        Q   Okay.  So in your initial disclosure, you          6   okay.
 7   attempted to list everyone who you felt was still at the    7        Q   (By Ms. Brim)  Do you recall the parking lot
 8   restaurant location?                                        8   being fairly full?
 9        A   Yes.                                               9        A   Yes.  The parking was full.  The restaurant was
10        Q   So all of the people on the list did not         10   very busy when we got there.  We had to wait almost an
11   necessarily see the fall?                                 11   hour, I believe, to be seated.  It was very full.
12        A   Correct, correct.  Gareth I know had pulled     12        Q   Can you draw, to the best of your recollection,
13   out.  Everyone else was nearby or standing on the curb   13   the path that you walked coming into the restaurant.
14   as I walked to go get the vehicle.  So what they saw or  14        A   (Deponent complied.)
15   not, I'm not positive.  I haven't spoke to all of them.  15        MR. LAIRD:  Do you want me to just take a quick
16        Q   When you arrived at Hacienda that evening, was 16   break and get you a marker?  Unless you think that's all
17   it still light outside?                                  17   right.
18        A   Yes, it was.                                    18        MS. BRIM:  I think this is fine.  Do you
19        Q   How light was it outside; meaning, was it dusk, 19   want --
20   or was it still like daylight?                           20        MR. LAIRD:  Yes, that's fine.
21        A   I believe it was still daylight.  Getting       21        MR. BOST:  Can I look at that just so I can --
22   towards dusk, I guess.                                   22        Okay.  Sorry.
23        Q   Who did you ride to the restaurant with?        23        Q   (By Ms. Brim)  Okay.  And can I have you draw a
24        A   I rode with, I believe it was me, Travis        24   little arrow on your line pointing towards the
25   Laplante, Leslie Johnson, and Larry Pribyl.              25   restaurant so we can see the path, the way you went.

                                                   29                                                     31
 1        Q   Was there a happy hour or any kind of food and    1        A   Yes.  Got you.
 2   drink event at the end of the meetings before you went    2        Q   Do you recall seeing any snow or ice in the
 3   to the restaurant?                                         3   Hacienda parking lot as you walked into the restaurant
 4        A   No, ma'am.                                        4   from the vehicle?
 5        Q   Okay.  So had you consumed any alcoholic          5        A   Only in like these grass areas.
 6   beverages that day before you went to the restaurant?      6        Q   What grass areas do you mean specifically?
 7        A   No, I had not.                                    7        A   These grass areas that separate the parking lot
 8        (Deposition Exhibit 1 was marked.)                    8   and the perimeter of the parking lot.
 9        Q   (By Ms. Brim)  Mr. Pilatti, you are looking at    9        Q   And are you talking about snow on the grassy
10   a photo that's been marked as Exhibit 1.  And do you     10   areas?
11   recognize Hacienda Colorado in this photo?               11        A   Uh-huh, but they could have even possibly been
12        A   Only because I've been recently shown some      12   shoveled on to those areas.
13   aerial photos of it since the incident, but otherwise I  13        Q   Where specifically do you recall seeing snow on
14   wouldn't.  But, yes, I believe this is Hacienda Colorado 14   the grass areas?
15   Lone Tree.                                               15        A   All over this grass; all over this grassy area
16        Q   Meaning it's the location that the --           16   up here.
17        A   Yes, ma'am.                                     17        MR. LAIRD:  You probably need to describe it
18        Q   -- incident occurred at?                        18   so --
19        A   Yes.                                            19        Q   (By Ms. Brim)  Okay.
20        Q   Can you draw a circle in the picture for where  20        A   So the grass was elevated -- or the snow was in
21   the car you were driving in parked that evening?         21   the elevated areas of the parking lot and moved out
22        A   Yes.  So, again, the spot may not be exactly    22   of the -- I guess it was in those elevated grassy areas
23   on, but I believe we were parked somewhere in this area. 23   that were not being driven on.
24        MR. LAIRD:  Do you want a marker?                   24        Q   And when you say that elevated grassy areas,
25        MR. BOST:  I have a marker.                         25   for the record, you mean the areas that have trees and
```

**Page 32**

1  that are in between --
2  A  Yes.
3  Q  -- parking spaces?
4  A  Yes. And they're raised up about six inches
5  with the curb, you know.
6  Q  Okay. Do you recall those areas being
7  completely covered with snow?
8  A  I don't recall exactly how much snow was there.
9  Q  Okay. Could you tell that they were grass
10 areas?
11 A  No -- well, only because of common sense.
12 Q  Okay. So you believe they were so covered with
13 snow, you couldn't see any grass?
14 A  To my recollection, yes.
15 Q  Did you see any snow on the surface of the
16 parking lot?
17 A  No, not that I could see, that I recall. But,
18 again, I didn't observe the entire parking lot.
19 Q  Did you see any ice on the surface of the
20 parking lot?
21 A  No, I did not.
22 Q  And I assume that you walked into the
23 restaurant with Travis, Leslie, and Larry?
24 A  Uh-huh.
25 Q  Did either Travis, Leslie, or Larry make any

**Page 33**

1  comment about snow or ice in the parking lot on the way
2  into the restaurant?
3  A  They did not at that time, no.
4  Q  Did you walk in with any other people in your
5  party?
6  A  The other -- like I said, everyone had arrived
7  at a similar or the same time, so I'm not exactly sure
8  where they parked. I believe it was somewhere in the
9  next row in front of us. And some of them, you know,
10 kind of congregated in little groups and, Hey, we're
11 going into dinner, and we all just walked in.
12 Q  Did you slip on anything in the parking lot on
13 your way into the restaurant?
14 A  No, I did not.
15 Q  To your knowledge, did anyone else in your
16 dinner party slip in the parking lot on the way into the
17 restaurant?
18 A  No, but to my knowledge, after the fact, I was
19 told that Derrick Seay did witness a spot of ice outside
20 of where their vehicle had parked. But that was not
21 given to me until after I was in a pile and talking to
22 them.
23 Q  Okay. Who told you that?
24 A  Derrick Seay when we were talking to people
25 after the incident. And he said, Yes, there was a patch

**Page 34**

1  right outside our car. It looked just like a little
2  water spot, but it was apparently really slippery, is
3  what he had said.
4  Q  When did Derrick tell you that?
5  A  This was like the next day after I got out of
6  the hospital and kind of touched base with those people
7  and everyone. I don't recall exactly the time. It was
8  kind of a crazy couple days after that.
9  Q  Did Derrick say that after you had specifically
10 asked him if he had seen any ice in the parking lot?
11 A  No, no. He said it after I slipped and broke
12 my leg.
13 Q  And he just told you that he believes he saw
14 some ice outside of where --
15 A  Uh-huh. Apparently he said he had seen when he
16 got out, and they had made note of it or made comment
17 about when he got out of the car, that it had looked
18 like a water spot, but it was already really slippery.
19 Q  How did he know that it was slippery?
20 A  I don't know. You would have to ask him.
21 Q  But he didn't tell you that anyone slipped on
22 it?
23 A  No, not to the point that they fell or
24 anything, so nobody acknowledged that.
25 Q  So to your knowledge, no one who was in your

**Page 35**

1  dinner party, other than yourself, slipped on anything
2  in the parking lot that night?
3  A  As far as my knowledge, yes.
4  Q  Before your fall occurred, did anyone in your
5  dinner party make any comment about the condition of the
6  Hacienda parking lot?
7  A  No.
8  Q  Before your fall occurred, did you hear anyone
9  else at the restaurant that night make any comment about
10 the condition of the parking lot?
11 A  No.
12 Q  Before your fall occurred, did you see anyone
13 at the restaurant slip in the parking lot?
14 A  No.
15 Q  And you didn't have trouble walking from the
16 vehicle you were in into the restaurant that night?
17 A  No, I did not.
18 Q  What were you wearing that night?
19 A  I was wearing jeans and tennis shoes and a
20 T-Mobile sweatshirt.
21 Q  By tennis shoes, do you mean running shoes?
22 A  I mean, similar -- like shoes I have on right
23 now.
24 Q  Okay. So --
25 A  Casual tennis shoes.

```
                                                    48
1   as I fell, and he came right to me.
2       Q   And I will have you just describe the fall for
3   me.
4       A   Yes. So it happened very fast. I was walking,
5   and I all of a sudden slipped, what felt like my feet go
6   out to the left from under me very fast. I started to
7   go down to the right. That's when I felt a pop and just
8   a rush of pain and intense heat. It felt like heat and
9   just a ton of pain just, I mean, rocking my body. And
10  then I hit the ground and screamed for help. I needed
11  help. So it was almost an instinctual kind of cry out
12  where I didn't know what was going on once I had fallen.
13  That's, I guess, the only way I can describe it; fast
14  and painful.
15      Q   When you say your feet went to the left, you
16  mean your feet slipped out from under you and both went
17  to the left?
18      A   My left foot went, my right foot is the one
19  that kind of slipped -- like all my weight I think
20  slipped out, and it put all that weight on that side,
21  and then the right leg just gave way. I assume it was
22  slipping, but it snapped. So, yes, I guess both feet.
23      Q   What part of your body did you fall on?
24      A   My right side.
25      Q   You didn't injure any of part of your body,
```

```
                                                    49
1   other than the right leg and ankle, in the fall?
2           MR. LAIRD: Objection.
3           Go ahead.
4       A   Right. Not that needed any sort of medical
5   attention.
6       Q   (By Ms. Brim) Okay. Do you recall having pain
7   in any other part of your body immediately after the
8   fall?
9       A   No. It was very much in the leg.
10      Q   Did you have anything in your hands at the
11  time?
12      A   No.
13      Q   And what did you do immediately after you fell?
14      A   I screamed for help. Chris came to me and got
15  up to me, and I immediately said to him, I think I broke
16  my fucking leg, excuse my language.
17          And he said, Really?
18          And I said, Oh, yeah, yeah. And he waved over
19  for some more help. I'm not sure who got to me. I
20  think it was probably Travis and Derrick, they kind of
21  lifted me up a little bit. One of them holding my leg
22  here and my arms, and they carried me over to the
23  sidewalk in front of the restaurant and sat me down.
24      Q   Did you see anything on the surface of the
25  parking lot that you believe you fell on?
```

```
                                                    50
1       A   Not before I fell, but it appeared to be what I
2   would call a stream of what I came to believe to be
3   black ice that had formed running down the parking lot.
4   This parking lot is kind of slanted at an angle, so it
5   was like a stream spot going down that I had stepped on
6   and kind of went with the flow of.
7       Q   When did you see that?
8       A   Right there as I'm laying on the ground.
9       Q   Were you laying on top of ice?
10      A   It was -- yeah. I was kind of -- well, I don't
11  know how to describe this. So let's say I'm laying this
12  say, so the stream is going like this at an angle, so
13  part of my legs and part of my body would have been
14  still on the ice. My upper half would be near the edge
15  of the ice and looking at more of it coming down.
16      Q   Were your clothes wet at all after the fall?
17      A   I do not recall.
18      Q   Can you estimate how large the icy area was?
19      A   Probably 10 to 18 inches wide. As far as how
20  long it went, I couldn't be positive because I didn't
21  see the beginning or the end of it. But I would -- you
22  know, from what I -- from what I could see, it appeared
23  to be beginning at this elevated curb area and running
24  through the entire parking lot. So it went across that
25  entire corridor that I was walking through.
```

```
                                                    51
1       Q   But you didn't actually see the ice beginning
2   at the elevated curb area. You're just assuming that?
3       A   That is where it appeared to be beginning for
4   me. I did not see where it ended though.
5       Q   Okay. Did you specifically see where it
6   started from?
7       A   To me, it appeared to start from this center
8   area.
9       Q   Were there cars parked at the center area?
10      A   Yes, I believe so.
11      Q   Okay.
12      A   There were cars parked in the parking spots.
13      Q   So would you have been able to see the surface
14  of the parking lot at the spot where you think the ice
15  was starting from?
16          MR. LAIRD: Form and foundation.
17      A   Yes.
18      Q   (By Ms. Brim) How?
19      A   With my eyes.
20      Q   So there was not a car parked --
21      A   I was laying on the ground, so I could see
22  underneath the car.
23      Q   So you think --
24      A   Ma'am, to me, I'm telling you, my only answer I
25  can tell you is that it appeared to begin here. That's
```

52

1  where it appeared to begin to me. I did not go research
2  further than that above into the other parking areas. I
3  had a leg broken at four places at that point. So to me
4  it appeared to begin, yes, there at that raised center
5  area.
6      Q   Okay. But my question is whether you actually
7  observed the ice coming from the raised center area to
8  the spot where you fell.
9      A   I cannot be sure.
10     Q   Okay. Did you -- do you believe that you
11 looked up under a vehicle and saw the ice from under the
12 vehicle?
13     A   Yes. I believe that the ice was running from
14 that area to where I slipped, and furthermore to -- the
15 parking lot, ma'am, is designed, it felt like, for stuff
16 to run off, okay? So that's what it appeared to me to
17 be happening. I don't know how you want me to answer
18 that in any more detail. If you want me to say no, I
19 will say no for you. But I'm telling you, to me, it
20 appeared to begin here. That's my opinion.
21     Q   Okay. And what I'm trying to differentiate is
22 what your opinion is versus what you saw. So what I
23 want to know --
24     A   I saw ice that appeared to be running from this
25 area.

53

1          THE DEPONENT: Am I wrong here? Am I
2  answering?
3          MR. LAIRD: Just answer the question.
4          THE DEPONENT: I'm sorry.
5      A   This is where it appeared to begin for me. I
6  can't tell you whether or not if I went five feet over
7  here, the ice was starting there too. I don't know.
8  This is what appeared to me. This is what I saw. The
9  ice began there. That's what I'm telling you.
10     Q   (By Ms. Brim) Okay. So if you would let me
11 finish my question before you --
12     A   Yes.
13     Q   -- start to answer.
14     A   I'm sorry.
15     Q   Okay. So can you draw an X on Exhibit 1 for
16 the spot where you fell.
17     A   I believe I fell somewhere in this general
18 area. There may have been a couple parking spots to the
19 left or to the right, but somewhere right there in that
20 general area.
21         MR. BOST: Thank you.
22     Q   (By Ms. Brim) So looking at Exhibit 1 -- and
23 you have now drawn an X for where you believe you fell.
24 To the -- okay. So to the right of the X, there is a
25 white vehicle, and then to the left of the X is there

54

1  looks to be like a blue vehicle in the photo. Do you
2  see where I'm pointing?
3      A   Uh-huh.
4      Q   So to the left of the X where the blue vehicle
5  is, at the time of your fall, was there a vehicle in
6  that space where the blue vehicle is?
7      A   I have no idea.
8      Q   Okay. Do you know whether there was a vehicle
9  in the spaces next to where the blue vehicle is?
10     A   I have no idea.
11     Q   So you don't specifically recall any vehicles
12 in the spaces where --
13     A   I don't recall what spaces had vehicles in them
14 at the time. I know that there were many patrons still
15 at the restaurant, and many of the parking spaces were
16 still full. Which ones specifically, I cannot recall.
17     Q   Okay. Do you specifically recall seeing an ice
18 patch that stretched from the grassy median to the spot
19 where you fell?
20     A   Yes. But, again, as we already clarified, that
21 thing could have started somewhere else as well. But to
22 the best of my knowledge, that's where it started, and
23 that's where we're agreeing now that it first started.
24     Q   And you said something earlier about the way
25 the parking lot appeared to be designed. Can you tell

55

1  me a little bit more about that?
2      A   The parking lot is slanted this way and also a
3  little bit this way, so it slants towards the hotel and
4  also a little bit towards Hacienda Colorado.
5      Q   Where do you believe it starts slanting towards
6  the hotel?
7      A   I have no idea. I believe that the parking lot
8  is poured like that. It's at an angle.
9      Q   Why do you believe that?
10     A   Well, because of my experience there. Also,
11 several weeks after it occurred, I asked one of my peers
12 to go back to the spot and take some photos for me, and
13 so I had a recollection of where and what occurred. And
14 that was his opinion too, was that it is really slanted,
15 and it appears this stuff is running down this way. So
16 he tried to take photos that would capture that
17 gradient.
18     Q   Who did you ask to go take the photos?
19     A   Jeremy Jodszuweit.
20     Q   I'm sorry. What was his last name?
21     A   Jodszuweit, J-o-d-z-s-e-w-e-i-t [sic];
22 something funky like that.
23     Q   Did Jeremy take photos?
24     A   Yes.
25     Q   Do you have those photos?

```
                                                     64
 1        MR. LAIRD:  I guess our noise cancellation
 2   isn't working right now.  We are all privy to his legal
 3   advice.
 4        MR. BOST:  The privilege has been violated.
 5        MS. BRIM:  Thank you.
 6     Q   (By Ms. Brim)  Okay.  So did you see the ice
 7   that you believe you fell on at all before the fall?
 8     A   No.
 9     Q   What color was the ice patch?
10     A   It looked wet as opposed to a color.
11     Q   So it was not white at all?
12     A   No.
13     Q   Are you sure that it was solid ice, as opposed
14   to just water?
15     A   Yes.
16     Q   Did you have your cell phone with you that
17   night?
18     A   I did.
19     Q   I assume you have a smartphone?
20     A   Yes, ma'am.
21     Q   Did you take any photos of the ice patch that
22   night?
23     A   No, I did not.
24     Q   Did you ask anyone else to take any photos of
25   the ice patch that night?
```

```
                                                     65
 1     A   No, I did not.
 2     Q   To your knowledge, did anyone who was at the
 3   restaurant that night take any photos of the ice patch?
 4     A   No, we did not.
 5     Q   Okay.  You know that that did not take place?
 6     A   Correct.
 7     Q   Okay.  Why not?
 8     A   Why didn't they?
 9     Q   Yes.
10     A   Or why do I know they didn't?  Why didn't they?
11     Q   Yes.  Why don't they?
12        MR. LAIRD:  Well, form and foundation.
13        Go ahead.
14     A   Just had no real reason to at the time.  I
15   mean, it was the furthest thing from my mind.  We wanted
16   to go over there and get treatment right away.  I was in
17   a ton of pain, and there was no reason for me to need
18   photographs or anything, that I felt.
19     Q   (By Ms. Brim)  Do you believe that had someone
20   taken a photo of the ice patch, it would have been
21   visible in the photograph?
22        MR. LAIRD:  Form and foundation.
23     A   I think it all depends on the angle of the
24   photo and the lighting in the photo.  You know, black
25   ice is difficult to see depending on the conditions, but
```

```
                                                     66
 1   it could have been visible, yes, depending on the photo.
 2     Q   (By Ms. Brim)  Who went with you to the
 3   hospital?
 4     A   Travis, Gareth, Leslie, Jeremy came over for a
 5   little bit but didn't stay the whole time.  Did I say
 6   Larry already?
 7     Q   No, I don't think so.
 8     A   And then Larry was there as well.
 9     Q   So Travis, Gareth, Leslie, and Larry; is that
10   correct?
11     A   Uh-huh, and Jeremy stopped by and came over to
12   near the restaurant.  He came over while I got checked
13   in, and it was obviously going to be a while, so he left
14   to get his own vehicle.
15     Q   Who drove you to the hospital?
16     A   Travis, I believe.
17     Q   And then everyone else remained at the
18   restaurant when you left to the hospital?
19     A   Just about -- well, actually, I believe that
20   the other -- because Candy and them were all at the
21   hospital.  So I think everybody came.  Gareth had
22   already left.  It was basically -- Chris Bush left.  He
23   didn't come to the hospital.  The other people that had
24   the other vehicle that had the other people, like, came
25   just to make sure I got there and everything, and then
```

```
                                                     67
 1   they left to go back to the hotel.  Gareth turned around
 2   and drove back to the hospital to come there and be
 3   there when I got admitted, so that's all who was there.
 4     Q   Did anyone from the dinner party go back to
 5   Hacienda on the night of the incident after going to the
 6   hospital?
 7     A   No, not that I -- not to my knowledge.
 8     Q   And no one went back to Hacienda the next day?
 9     A   No.
10     Q   Did you consider asking anyone to go back to
11   the restaurant to take a photo of what you fell on?
12     A   No.
13     Q   Why not?
14     A   I just didn't -- I didn't have a reason to at
15   that time.  I didn't think of why I needed a picture of
16   the ice.
17     Q   And I assume that the people that were with you
18   at dinner would also have had smartphones with them?
19     A   Uh-huh.
20        MR. LAIRD:  Form and foundation.
21     Q   (By Ms. Brim)  As you were waiting on the curb
22   before you went to the hospital, who was out there
23   waiting with you?
24     A   To the best of my memory, it was everyone that
25   I listed, so Leslie, Jeremy, Larry, Travis, Derrick.  I
```

## Page 152

1  Q   That's your --
2  A   That's my profile picture, yes.
3  Q   There are some places in this set of messages
4  where there is your profile picture, and it has "Write a
5  comment," but then there is no comment shown.
6  A   It's because this is just copied and pasted
7  from a Facebook page.  So anytime somebody comments on
8  your stuff, your little profile is going to sit right
9  next to it and say "Comment" where you can fill it in.
10 I never wrote a comment, so you don't see one there.
11 There is nothing omitted from here.
12 Q   Okay.  And on the fifth page of the exhibit --
13 A   Okay.
14 Q   -- there is a message you're talking about your
15 work team, your work team has been so awesome.  Do you
16 see that?
17 A   Uh-huh -- wait.  Where?  What page?
18 Q   I think it's Page 5 of what I have.
19    If you could turn one more page.
20 A   Oh, okay.  Yes.
21 Q   So it sounds like you were very pleased with
22 how helpful everyone at work was --
23 A   Uh-huh.
24 Q   -- after the accident?
25 A   Uh-huh.

## Page 153

1  Q   And it seems like they tried to make you as
2  comfortable as possible --
3  A   Uh-huh.
4  Q   -- after the incident, correct?
5  A   Uh-huh.
6  Q   Did you have help at home as well while you
7  were off work after the incident?
8  A   Not a ton.  Obviously, I have my children and
9  my live-in girlfriend, but she works a full-time job.
10 My mother was able to help me a little in the sense that
11 we brought a miniature refrigerator and a little
12 microwave and toaster oven, because the couch I
13 generally laid on was upstairs, because that's easier to
14 get to the bathroom and get wherever I needed to go.  So
15 we moved those things upstairs so that I could eat
16 throughout the day without having to go down, because I
17 was generally home alone for most of the day.  So not a
18 ton of help at home, but obviously I had my family and
19 loved ones to help me when needed.
20 Q   I did want to show you -- I'm not going to mark
21 this as an exhibit, but this form was in the set of
22 documents that we received, but it's not filled out.  Do
23 you recall ever filling out this form?
24 A   No.
25    THE DEPONENT:  Sorry.

## Page 154

1     MR. LAIRD:  No, you're fine.
2  A   Not that I recall.  I mean, there were so many
3  forms I filled out for L&I and everything else that I
4  may have filled out a form similar to this before, but I
5  don't know.
6     MR. LAIRD:  I would just ask that we mark that
7  as an exhibit because you asked about it.
8     MS. BRIM:  Okay.  We can mark it.
9     (Deposition Exhibits 12 and 13 were marked.)
10 Q   (By Ms. Brim)  And I have one incident report
11 as well.  This incident report has been marked
12 Exhibit 13.  Did you fill out some portions of this?
13 A   Some portions, yes.
14 Q   And it looks to me like the portion in the box
15 at the bottom is something that Dr. Carlson did filled
16 out?
17 A   Yes.  I did not fill out that, and I did not
18 put my name on it.  Everything else is --
19    MR. BOST:  I'm sorry.  What exhibit is this?
20    THE DEPONENT:  13.
21 A   Everything else appears to be my handwriting.
22 Q   (By Ms. Brim)  Okay.  Did you fill out any
23 other written report regarding the incident other than
24 this form?
25 A   Not that I'm aware of.

## Page 155

1  Q   When you say -- on here it says, "Did you
2  report the incident to your employer?"  It says yes, and
3  it has Gareth Nugent, and that was, of course, on the
4  night of the incident.  Was there anyone else at work
5  who you reported to about the incident and described the
6  incident to?
7  A   Yes.  I mean, our LOA people, but it was just,
8  Hey, we understand there was an incident, you're
9  injured.  How is everything going?  Are you okay?  What
10 do you need?  Here is what you're going to expect.  If
11 you have any questions, call us.
12 Q   Did you give any recorded statement about the
13 incident?
14 A   Only to Dr. Bulley.
15 Q   Do you have any specific reason to believe that
16 Hacienda knew about the ice patch you fell on?
17    MR. LAIRD:  Form and foundation.
18 A   I don't have any specific reason to think that
19 they knew about it, but I feel that they should have
20 known about it or been aware of it or had some sort of
21 procedure in place to have made them aware of it.  If
22 they did know about it and chose to do nothing, even
23 more of a concern.  But I have no reason to think they
24 were informed or that they knew.  I have no evidence
25 that they were told ahead of time.

160

1  prevent your accident?
2    A  Possibly.
3    Q  Were you looking where you were going before
4  the accident occurred?
5    A  Yes, sir.
6    Q  Were you looking at the ground?
7    A  I don't recall that I was looking directly at
8  the ground, but I was aware of my surroundings, and I
9  was walking by myself with nothing in my hands and
10 looking where I was going.
11   Q  You spent enough time sitting there on the
12 ground after you fell down, right?
13   A  Right.
14   Q  And you noticed there was ice under you?
15   A  Yes.
16   Q  And when you stood up, were you able to see the
17 ice on the parking lot, or not?
18   A  You know, I was lifted up, and at that point
19 once I started lifting up, I wasn't looking for that.
20 So I couldn't tell you if it was visible or not. I did
21 not look at it and see it.
22   Q  So you don't know if it was visible to a person
23 standing next to it?
24   A  Correct, because I didn't go back and really
25 look. But from what it looked like from the ground

161

1  perspective, and what I believe the others will tell
2  you, it appeared like a black wet strip down the parking
3  lot, is what it appeared to look like.
4    Q  So what you saw, to your best recollection, is
5  it looked like water on the ground?
6    A  Yes. And in my opinion, I assume it would have
7  been visible from a standing position as well had I been
8  looking directly for it.
9    Q  Now, you had walked through that same area into
10 Hacienda. That was during the day when the sun was up,
11 correct?
12   A  That's correct.
13   Q  Do you believe that what happened here was
14 water had melted from the snowy medians in the parking
15 plot, drained into that area, and then froze while you
16 were inside having dinner?
17   A  Yes.
18   Q  That's the most logical thing you can think of?
19   A  That's the most logical thing that I attested,
20 yes, that I came up with.
21   Q  Now, my client is Emerald Isle Landscaping.
22 Can you tell me what they did that caused your accident?
23     MR. LAIRD: Foundation.
24   A  I have no idea, sir, what they did or didn't
25 do. I just know that the parking lot was not safe, and

162

1  that there was ice in the parking lot on that particular
2  occasion.
3    Q  (By Mr. Bost) Okay. My client, according to
4  all the records we have in this case, had not been out
5  to that property in two weeks.
6    A  Uh-huh.
7    Q  Do you know, based on the fact that you brought
8  suit against my client, what it should have done during
9  that period of time to prevent your accident from
10 occurring?
11     MR. LAIRD: Form and foundation.
12   A  You know, I'm not sure. I'm not an ice removal
13 expert, obviously. Honestly, not knowing how that whole
14 process works, I feel they probably come when called
15 upon or scheduled. I feel like maybe providing salt
16 options for the restaurant so that they could take care
17 of maybe spots like that themselves, or issues like that
18 that come up. There possibly could have been some of
19 that.
20     Or maybe even a deeper level of training when
21 you take on a client, what you ask them to do or what
22 level of responsibility do you pass on to them during
23 the times you're not scheduled to go out there and
24 visit. I don't know. There possibly could have been
25 some procedures or some management systems, as I like to

163

1  call them, in place for the restaurant itself to do
2  something like that during those times when your company
3  was not present.
4    Q  (By Mr. Bost) Was there two inches of snow on
5  the -- two inches of depth of snow on the parking lot
6  when your accident occurred?
7    A  On the actually parking lot, no.
8      MR. LAIRD: Form and foundation -- actually,
9  just foundation.
10   A  No, there was not.
11   Q  (By Mr. Bost) You were there at the time,
12 correct?
13   A  Was I there when I fell?
14   Q  You were in the parking lot just before the
15 accident.
16   A  Yes, sir.
17   Q  And you were able to observe there were not two
18 inches of snow on the --
19   A  On the standing ground part, correct, yes.
20   Q  As part of your job, do you ever draft or
21 review contracts?
22   A  No. I mean, customers enter into service
23 agreements or payment contracts on the phones they
24 purchase, but that's handled on the front line, on the
25 retail side. I don't get totally involved in that.

172

1  have handled situations like this, my thought would be
2  that somebody should be responsible for making sure the
3  parking lot is safe.
4    Q  So there was a point, I would say, what, close
5  in time to the accident where you finally thought, you
6  know what, somebody else to blame for this accident?
7    A  Yes, but not in the sense that I felt like I
8  needed to file a lawsuit.  I think that all kind of came
9  at the recommendation once I consulted with attorneys
10 and said --
11   Q  Okay.  I don't want to know anything your
12 attorney told you.
13   A  Got you.
14   Q  So soon after the accident, were you of the
15 opinion that nobody else was at fault for the accident?
16   A  Honestly, I don't think I was trying to place
17 blame, so I can't recall like what my thought process
18 was around that.
19   Q  Do you know if you ever indicated to somebody,
20 whether in writing or verbally, that you didn't think
21 somebody else was at fault for the accident?
22   A  No, not that I recall.
23   Q  I would like for you to take a look at
24 Exhibit No. 13 again.
25   A  Okay.

173

1    Q  That's that questionnaire that you filled out,
2  and it looks like Dr. Carlson wrote some stuff on as
3  well.
4    A  Uh-huh.
5    Q  The box area, you see things are numbered 14
6  through 32 over on the right-hand side?
7    A  Yes.
8    Q  Or 29, that little box.  That's all stuff that
9  you filled in, right?
10   A  Yes.
11   Q  I wanted to point you to No. 23 there.  And it
12 asks, "Injury caused by a faulty machine, product or
13 person other than my employer or coworker?"
14      And you checked the box no, correct?
15   A  Uh-huh.
16   Q  Is that correct?
17   A  Yes, I did.
18   Q  And when did you sign and date this document?
19   A  It appears that I did that on January 25th.
20   Q  So that's about a week after --
21   A  Yes, sir.
22   Q  -- your accident, correct?
23   A  Uh-huh.
24   Q  Is that correct?
25   A  Uh-huh.

174

1    Q  Is that a yes?
2    A  Yes, sir.
3    Q  Okay.  So up to that period of time or after
4  that period of time, you were not of the opinion anybody
5  was responsible for your accident?
6       MR. LAIRD:  Form and foundation.
7    A  I think I would have to go back to my state of
8  mind at this time.  I obviously was on painkillers for
9  the week leading up to this after the incident had
10 happened.  And even reading it now, I think I may have
11 read it that there wasn't a faulty machine or product.
12 Like I could eat a bad tomato, do you know what I mean?
13 Or try and use a product that was faulty.
14     And I don't believe there was necessarily a
15 specific person employed by Hacienda Colorado who is
16 responsible for my injuries, but I feel there is kind of
17 negligence of the organization as a whole that caused
18 it.  But I couldn't tell you what I was thinking there
19 when I checked that, but to my best recollection, that's
20 what I was thinking and why I marked that no.  I was
21 more so referring to a specific person, product, or
22 machine didn't cause it.
23   Q  (By Mr. Bost)  Is any of the other information
24 you filled out on this document incorrect?
25      MR. LAIRD:  Form and foundation.

175

1    A  Not to my knowledge.
2    Q  (By Mr. Bost)  So everything but that would be
3  correct that you put in the document?
4       MR. LAIRD:  Form and foundation.
5    A  As far as I can see, yes.
6    Q  (By Mr. Bost)  Do you drink alcohol?
7    A  No.
8    Q  Not at all?
9    A  Maybe occasionally I will have a drink or
10 something socially at an occasion.  But, no, I don't
11 tend to drink and don't really drink in those type of
12 social settings, so, no.
13   Q  What about not in social settings?
14   A  No, not at home.  There might be just a one-off
15 with somebody at a dinner or something I might have a
16 drink, but I'm not a drinker.
17   Q  Who did you sit with at the restaurant that
18 night?
19   A  The entire party.  I can't recall exactly who
20 was sitting next to me.
21   Q  It was a big table?
22   A  Yes, it was a big, long table.
23   Q  Other than that patch of ice that you slipped
24 and fell on, you didn't observe any other ice in the
25 parking lot, correct?

**Page 176**

1  MR. LAIRD: Form and foundation.
2  A   Correct.
3  Q   (By Mr. Bost) And I think you testified that
4  there were a lot of people in the restaurant. The
5  parking lot was pretty full of vehicles when you went
6  in, right?
7  A   Yes, sir.
8  Q   Do you have any indication indicating that any
9  of those patrons slipped on ice?
10 A   I have no information.
11 Q   You testified at one point today, you said --
12 and you started off with "to be completely honest," and
13 then you said you may have walked over the snowy median
14 on the way into the restaurant?
15 A   Uh-huh.
16 Q   Is that correct?
17 A   Yes.
18 Q   What made you think you might have done that?
19 A   Because I'm just -- I don't -- you know, I
20 can't really remember exactly how I walked or where I
21 walked. And I just know that the other party had
22 parked, and I was trying to put myself back there. I
23 know that they had parked in the row more towards the
24 freeway from us, so up closer.
25     And I felt like we kind of went and connected,

**Page 177**

1  you know, mid -- you know, we kind of -- what do you
2  call that? We flowed in together. So it's possible
3  that I stepped out of the car and stepped over that into
4  the way that they walked in. But honestly I can't be
5  100 percent sure.
6  Q   Do you think it's more likely than not though
7  that you walked into that snowy area to go into the
8  restaurant?
9  A   I can't say more likely than not. For me -- I
10 don't exactly recall, so I wouldn't want to stay that
11 when I don't exactly know.
12     But you know what? It probably is more likely
13 than not that I did step over that and walk the other
14 way.
15 Q   That you actually stepped into that snowy
16 place?
17 A   I don't know.
18 Q   If you don't know something, just tell me you
19 don't know.
20 A   I don't know. I don't know. I would be
21 totally speculating. I'm trying to like jog my memory,
22 and I don't know if it's a real memory.
23 Q   Now, you indicated -- and I will refer you to
24 Exhibit No. 3.
25 A   Yes, sir.

**Page 178**

1  Q   That first page where --
2  A   Okay.
3  Q   -- you put the X where you slipped and fell.
4  A   Uh-huh.
5  Q   And then you kind of drew the stream of ice
6  there.
7  A   Yes, sir.
8  Q   Now, you testified that you thought the width
9  of the ice was around 10 to 18 inches wide. Do you
10 remember that?
11 A   Uh-huh.
12 Q   Is that a yes?
13 A   Yes, sir.
14 Q   And do you have any idea how long that stream
15 was?
16 A   I do not.
17 Q   Could it have -- do you know whether it was as
18 long as 3 feet?
19 A   It was longer than 3 feet.
20 Q   Do you know if it was as long as 5 feet?
21 A   It was longer than 6 feet at least.
22 Q   Okay. So you can say it's at least 6 feet long
23 and 10 to 18 inches wide?
24 A   And I would actually go as far as to say it was
25 probably at least 10 to 12 is feet, because it was to

**Page 179**

1  where I was at, my entire body length, and it continues
2  to go up through the cars. So it could have for sure
3  been -- and I don't know how far down the parking lot it
4  kept going.
5  Q   Okay. And you believe that it formed from that
6  grassy median area where the snow was located?
7  A   That's my best assessment of what occurred.
8  Q   Okay. Have you ever skied?
9  A   No, sir.
10 Q   Now, you encounter snow and ice in parking lots
11 when you're in Washington; is that correct?
12 A   Yes, sir.
13 Q   Is it your opinion that a property owner with a
14 parking lot needs to ensure that the entire parking lot
15 is clear of snow and ice?
16 A   Yes.
17     MR. LAIRD: Form and foundation.
18 Q   (By Ms. Brim) So not even a doily-size patch
19 of ice would be appropriate for a parking lot?
20     MR. LAIRD: Form and foundation.
21 A   I don't really know. I think all circumstances
22 are different, but, I mean, I think most businesses
23 should try and, yes, take care of all of that. Even
24 doily size, you're saying you're willing to take doily
25 size risk of someone's health and safety.

```
                                                        188
 1   and your knowledge of your body and what your leg is
 2   like now, if you had to put it into a percentage, what
 3   percentage would you say your leg is limited now than it
 4   was prior to the accident?
 5       A   I think --
 6           MR. LAIRD:  Form and foundation.
 7           Go ahead.
 8       A   -- it's closer to like 25 percent, is kind of
 9   how I feel.
10       Q   (By Mr. Bost)  You've lost about 25 percent?
11       A   Yes.
12       Q   And does that include the strength that you
13   have in your leg?
14       A   Yes.
15       Q   Does that include your range of motion?
16       A   Yes.
17       Q   Endurance?
18       A   Yes.
19       Q   And flexibility?
20       A   Yes, sir.
21       Q   So about 25 percent impaired?
22       A   I think the range of motion and flexibility may
23   even be more than 25 percent impaired in my opinion.
24       Q   What, as high as 35 percent?
25       A   Yes, possibly, depending on how much I can move
```

```
                                                        189
 1   it.  It feels like, yes, just barely over half as much
 2   as I can move this one.  I'm trying to figure out how to
 3   gauge those percentages for you.
 4       Q   Okay.  What did you do for exercise prior to
 5   the accident?
 6       A   You know, I'm pretty active just in my normal
 7   life, so walking the dogs and playing sports with my
 8   son.  I was a member of a gym for a short time, but we
 9   all know how gym memberships go.  So I couldn't ever say
10   I was really consistent.  But just general stuff.  I
11   wasn't a heavy workout person, but I stayed in pretty
12   good shape and tried to stay active, go hiking.
13           I live right on a river, so I spend a lot of
14   time down at the river with my kids and dogs and stuff
15   like that.
16       Q   If you had to rate your average pain in your
17   left on a level of 1 to 10 with 1 being no pain and 10
18   being excruciating pain, what would your average pain
19   be?
20           MR. LAIRD:  Form; asked and answered.
21       A   And the average based on like my whole life --
22   not my whole life, but ever since the incident for
23   24 hours a day?
24       Q   (By Mr. Bost)  A typical day.
25       A   The average pain, 3; 3 to 4.  I think most of
```

```
                                                        190
 1   the time it sits at around a 2 the 3, and there are
 2   periods throughout the day where it can really spike
 3   based soreness or movement.  So you add all those, the
 4   higher numbers to the lower numbers and average them
 5   out, I've got it around a 3, a 3 or 4.
 6       Q   Have you been on any vacations since the
 7   accident?
 8       A   Just this one.
 9       Q   Well, welcome to Colorado.
10       A   Thanks.
11           MR. LAIRD:  This is your welcoming committee.
12           THE DEPONENT:  That's pretty cool.
13           MR. BOST:  Those are all the questions I have
14   for you.
15           THE DEPONENT:  Thank you.  I appreciate it.
16                 E X A M I N A T I O N
17   BY MS. BRIM:
18       Q   Okay.  I have just a couple follow-up
19   questions.
20       A   Okay.
21       Q   You talked a good bit about the strip of what
22   you believe is ice that you fell on.
23       A   Yes, the ice.
24       Q   And I believe you said that it looked like
25   water, correct?
```

```
                                                        191
 1       A   It looked like frozen water.
 2       Q   And my question is, how do you know that it was
 3   ice?
 4       A   Because it was frozen, and I slipped on it, and
 5   it was clearly ice.  I mean, if the only question here
 6   is whether or not there was ice there on the ground that
 7   day, then we don't have a lot we need to talk about.  I
 8   mean, it was ice.  I don't know what else to tell you.
 9       Q   So you felt it after you fell, and it was a
10   hard substance?
11       A   Either that or they put a really slippery, hard
12   substance on their parking lot other than ice that
13   caused me to fall.  But, yes, in my experience it was
14   ice.
15       Q   You talked a little bit about snow and ice
16   mitigation procedures to some extent with your work at
17   T-Mobile.  Have you been involved in any legal claims
18   made to T-Mobile related to a slip and fall on snow and
19   ice in a parking lot?
20       A   Never.  We have never even had a single
21   incident report where it occurred at any of my stores.
22       Q   Did you see the ice patch that you believe you
23   fell on at any time before you fell?
24       A   No.
25       Q   Why do you believe that someone at Hacienda
```